162 N.J. Super. 187 (1978)
392 A.2d 621
LORRAINE LAVENE, PLAINTIFF,
v.
BERNARD LAVENE, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided July 31, 1978.
*191 Mr. Thomas Warshaw for plaintiff.
Mr. Stephen C. Carton for defendant.
ARNONE, J.S.C.
On June 6, 1975 the parties to this action were granted a dual judgment of divorce on the grounds of plaintiff's cruelty and adultery, and defendant's cruelty, after a trial which commenced on April 8, 1975 and concluded on April 24, 1975, consuming ten full days of trial.
Both parties appealed to the Appellate Division, with the result that the provisions of that judgment relating to custody, counsel fees and equitable distribution of the defendant's business interest were reversed and remanded for *192 further proceedings consistent with the Appellate Division decision. Lavene v. Lavene, 148 N.J. Super. 267, 278 (App. Div. 1977), certif. den. 75 N.J. 28 (1977). The Appellate Division reviewed all other issues raised by the parties on appeal and found no error therein.

I. Custody

[The court reviewed the facts at length and the applicable law, and determined that it would be in the best interest of the young daughter of the marriage to be continued in the custody of defendant father.]

II. Equitable Distribution

The Appellate Division also remanded for further factual findings with respect to the value of defendant's interest in Energy Storage Corporation, hereinafter ESC. ESC is a closely held corporation of which defendant is the president, and of which he is owner of 42.8% of outstanding stock.
The Appellate Division had found error in the determination made at the original hearing of this matter that the value of defendant's interest in the corporation was offset by the amount of the corporate loans he had guaranteed and that therefore the interest did not constitute a distributable asset.
A closely held corporation has been defined as a corporation in which the stock is held in a few hands, or in a few families, and wherein it is not at all, or only rarely, dealt in by buying and selling. Kascle, "Valuation of Closely Held Corporation," 43 TAXES  The Tax Magazine, 454 (July 1965).
The valuation of the stock of a closely held corporation calls for attempt to fix a fair market value for the stock  that is, the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of the relevant facts. It is *193 assumed that the hypothetical buyer and seller are able, as well as willing, to trade and to be informed about the property and the market for such property.
Determination of the fair market value of an interest in a close corporation has always presented difficulties. This is because
* * * Valuation of stock of a closely held company is an attempt to determine the fair market value of an asset which by definition does not have a fair market value, since a market wherein a willing buyer will meet a willing seller, neither under any compulsion, generally does not exist. The stock of a closely held corporation is as a rule offered for sale only under unusual circumstances. The number of prospects is usually extremely limited. [Tierney, "A New Approach to the Valuation of Common Stock of Closely Held Companies," Journal of Taxation 14 (July 1962).]
As a result, the valuation of the stock of a closely held corporation requires an entirely different approach than the valuation of any other asset. The valuation process has been described as a "matter of judgment and opinion rather than mathematics." Banks, "Present Value and the Close Corporation", 49 TAXES  The Tax Magazine, 33, 35 (January 1971). Each case presents a unique factual question, the solution to which is not within the ambit of any exact science. The reasonableness of any valuation depends upon the judgment and experience of the appraiser and the completeness of the information upon which his conclusions are based. Lawinger, "Appraising Closely-Held Stock  Valuation Methods and Concepts," 110 Trusts and Estates 816 (October 1971).
Revenue Ruling 59-60, C.B. 1959-1, 237 sets forth the proper approach to use in the valuation of closely held corporate stocks for estate and gift tax purposes. The approach, methods and factors set forth therein are equally applicable here. The factors which Revenue Ruling 59-60 sets forth as being fundamental and as requiring careful analysis in each case are:
*194 (1) the nature of the business and the history of the enterprise from its inception; (2) the economic outlook in general and the condition and outlook of the specific industry in particular; (3) the book value of the stock and the financial condition of the business; (4) the earning capacity of the company; (5) the dividend-paying capacity; (6) whether or not the enterprise has goodwill or other intangible value; (7) sales of the stock and the size of the block of stock to be valued; and (8) the market price of stocks of corporations engaged in the same or similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter.
The above is not an all-inclusive list and there is no formula for determination of their interaction. It should be stressed that no one factor or factors can be considered in a vacuum, but rather consideration must be given to the relationship of all relevant factors on the basis of informed judgment and common sense.
An examination by an appraiser of each factor listed in Revenue Ruling 59-60 would require the gathering of certain data. An analysis of the type of information that would be sought with respect to each factor would be as follows:

(1) Nature and History of the Enterprise.
Consideration of this factor would highlight operating and financial information, product or service changes, and growth or the lack thereof and other facts needed to form an opinion of the degree of risk involved in the business.

(2) Economic Outlook.
What are the current and prospective economic conditions as of the date of the appraisal, both in the national economy and in the industry with which the corporation is allied. Is the corporation competitive with, is it successful, when compared with other corporations in the same industry? Revenue Ruling 59-60, supra.
Revenue Ruling 59-60 notes that the fair market value of specific shares of stock will vary according to the degree of optimism or pessimism with which the investing public regards the future at the required date of appraisal. Highly uncertain future prospects of a company will have a definite effect on the value of the stock of that company. The effect *195 on the value of stock as a result of loss of the manager of a "one man" business is also to be considered.

(3) Book Value and Financial Condition.
Balance sheets should be obtained for several years and for a recent interim period, together with necessary supplemental schedules for review. From these data the appraiser may determine the capital structure, net worth, and financial ratios customarily regarded as significant in determining the soundness of a business enterprise.
Attention must be directed to the fact that rarely does the fair market value of a going industrial company equal the net book equity (book value) applicable to its common stock.
In all respects the relationship between the commercial value of a business and the so-called physical values of its assets is highly indirect and uncertain. Almost never does it justify an assumption that the "values" of the latter even roughly measure the value of the former. [Bonbright, Valuation of Property (1937), at 265]

(4) Earning Capacity.
It is recommended that detailed profit and loss statements be obtained and reviewed for a representative period, preferably five or more years, immediately prior to the required date of appraisal. Recognizing that potential future income is a major factor in valuing stocks of closely held corporations, Revenue Ruling 59-60 suggests a review of prior earnings as an approach to predicting the future. Officers' salaries and contributions made are singled out for a review as to reasonableness. Also, nonrecurring items of income and expense and the possible abandonment of loss lines of business with benefit to the company are considered as affecting potential earnings. It will be helpful, in judging risk and the extent to which a business is a marginal operator, to consider deductions from income and net income in terms of percentage of sales. Major categories of cost and expense to be so analyzed include the consumption of raw materials and supplies in the case of manufacturers, *196 processors and fabricators. Also, prospective earnings is acknowledged by valuation experts to be the most important factor in valuing operating companies whose worth is generally dependent upon continuation as a going concern.

(5) Dividend-paying Capacity.
A comment to Revenue Ruling 59-60 states "that dividends paid are a less reliable criterion of market value than other applicable factors. This is so in a closely held corporation because of the ability of an individual or group to control dividend payments to meet the needs of the stockholders or to substitute salaries or other emoluments therefor. However, if dividends are a factor in valuing a company, the appraiser should determine the indicated capacity for such payments rather than the historical record."

(6) Goodwill or Other Intangible Value.
Goodwill is based upon earning capacity. It may be defined as the whole complex of intangibles  the attitude and economic condition of old and new customers, the relations (legal and nonlegal) to employees and sources of supply, the quality of management, the ability of the organization to produce and market efficiently, the existence and character of competition, the general business conditions and prospects, and perhaps franchises and patent rights  which will enable the going concern to yield high earnings Kascle, "Valuation of Closely Held Corporations," supra at 454.

(7) Size of the Block to be Valued.
The presence or absence of the element of control, and the marketability of the stock, is an important factor. Control of the corporation may be defined as having 50% or more of the outstanding voting stock although the percentage will vary according to the size of the company. A minority interest is generally considered worth less than a proportionate interest in a controlling block, and often it will be appropriate to discount the proportionate share of the value of the enterprise, when considered as a whole, which is *197 attributable to the minority interest. Lawinger, "Appraising Closely-Held Stocks  Valuation Methods and Concepts," supra at 872-873.

(8) Market Price of Stocks of Similar Corporations.
The value of stock of corporations engaged in the same or a similar line of business which are either listed on an exchange or actively traded in an over-the-counter market should be taken into consideration. Whether the stocks are sold on an exchange or sold over-the-counter, the essential factors are that there be evidence of an active free public market for the stock as of the valuation date, and that only comparable companies are used. Revenue Ruling 59-60.
Once the appraiser has obtained, if possible, the above information, he can then proceed to the actual evaluation. Three principal methods which can be used for developing a value for ownership in a closely held corporation are as follows:
(a) Capitalization of indicated earnings at a reasonable return on investment based on relative risk and current interest rates.
This method requires analysis of the earning power of the corporation as it is related to the rates of return expected in the current money market for various types of investments with consideration given to expected rates of growth, risk and the potential time lag until a reasonable level of profit can be obtained. Based on this analysis the earning power is converted into a corresponding value.
This conversion is usually accomplished "by relating the rate of return expected to a corresponding multiple of net after tax income such as is represented by the price-earnings ratio often discussed in analysis of stock exchange traded equities." Lawinger, "Appraising Closely-Held Stocks  Valuation Methods and Concepts," supra at 817.
The appropriate rate to use in capitalization * * * is a matter of judgment based primarily upon the degree of risk associated with the probable future income stream and determination of what should be a fair return on the investment.

*198 The capitalizing procedure is appropriate where it appears that the operation can continue on for a long period as a profitable business.
(b) Comparison with price earnings ratios of publicly traded companies in the same or comparable industry.
In this second approach search is made for other enterprises which are comparable in size, growth characteristics, product line, market area, profitability, and financial condition. Where such businesses are found and where their common stock is publicly traded in an established market, the prices for which such shares are traded can help to form a basis for valuation.
Two important factors affect the reliance upon the analysis in this comparative market approach: (1) Degree of comparability between the companies; and (2) Weight to be accorded the evidence developed through this method of valuation. These factors impose difficulties, but when comparative companies are found, shares for which market prices are not readily determinable can be valued based on the price earnings ratios of the comparable companies. This method is preferable to selecting a price earnings ratio (or earnings multiplier) based only on assessment of risk and judgment as to the requirement for return on investments.
The capitalization factors used may be based on various forms of the income stream such as net income, per tax income, operating income or cash flow and on income adjusted for interest expense to give comparison on a debt free basis. [Id., at 818-819]
(c) Appraisal of all underlying assets, tangible and intangible, with adjustment for existing liabilities.
This method can be important in a valuation of closely held corporate securities and it may act as a check on the two previously discussed methods. It attempts to find the cost of reproducing the business enterprise and impels the individual responsible for the valuation to attempt to identify each element of value in the business, including those which do not contribute to current earnings or profitability. It is particularly applicable in valuing a real estate holding company or a firm in which the assets have doubtful applicability to the business actually conducted. The approach is also commonly recommended when the assets of a closely held company are to be sold as a group and allocation of the purchase or sales price to the various categories of assets is required.
A knowledgeable individual should make a technical study of the assets to evaluate adequacy of the facilities for the operation. *199 Any future capital outlay required to continue or expand business is extremely important as are physical properties with saleable value of the current market but which currently add nothing to operations or earnings; e.g., a large tract of recreation land being held as an investment.
The financial condition or solvency of the company and the adequacy of working capital are pertinent considerations. The need to borrow or obtain funds through advances from owners to continue operations affects the value of the ownership interest.
Like the other two methods, the valuation of the underlying assets may also require an estimate of future income. The indicated values of the combined classes of assets must be supported by the potential for a reasonable return in the form of dividend income and/or appreciation in equity value. Intangible assets should be recognized if present and the expected future income stream should also be capable of providing a fair return on any intangible asset assigned a specific value. The expense required to replace skills or intangibles lost from the operation due to the departure or death of key personnel is also considered. [Id.]
The above factors and methods are applicable to the closely held corporation, ESC, at issue here.
In its opinion the Appellate Division had pointed out that where appropriate the parties should assist the court in the appraisal of business interests by securing the assistance of appropriate experts to aid the court in the valuation process. Lavene v. Lavene, supra 148 N.J. Super. at 276. Here, both parties did secure the services of appraisers, both of whom testified at the rehearing of this matter. The weight to be accorded to the testimony of these witnesses, as with all expert testimony, depends upon the ability of the witness, his knowledge and his experience in the field. Savoia v. F.W. Woolworth Co., 88 N.J. Super. 153, 162 (App. Div. 1962). The expert's testimony will be entitled to little weight unless the witness can establish general and specific knowledge of the subject matter which will enable him to speak with authority. Id.
Morris Cinnamon, a certified public accountant, testified on behalf of plaintiff. He testified that he had evaluated approximately 200 closely held corporations similar to ESC over the course of his professional career. However, Cinnamon *200 also testified that in recent years he has not had a client in the electronics business. He testified that in preparation of his report (in evidence) he had examined the books and records of ESC and of ESC's subsidiaries. He did not review the plant facilities or sales records, and he made no determination as to the extent that ESC's financial success was dependent on defendant's ability.
The manner in which Cinnamon ascertained the fair market value of defendant's interest in ESC was explained in his report as follows:
We have taken two approaches in determining the fair market value of Energy Storage Corporation and its subsidiaries. The first was to take the January 3, 1975 book value, despite the fact that the Fixed Assets carried at a depreciated value of $147,259.97, may have been worth substantially more, eliminate the asset item "Excess Cost of Acquisition over Equity" and add to this figure a value for Good Will. In this method we have computed the Good Will factor by assuming there were no federal income taxes payable because of the net operating loss carryovers and by assuming what the Good Will factor would be in the event there were no federal income taxes payable.
The second approach was to capitalize the earnings. In this regard we wish to state that net income figures were accepted as stated in the outside auditors' reports, and no attempt was made to increase the auditors' net income figures by reason of possible excess salary of Bernard Lavene or others or due to excess fringe benefits paid.
Based on the two approaches described above, Cinnamon concluded that the fair market value of the corporation was $384,769.
Although he noted in his testimony that economic conditions would be a factor to be taken into consideration, there is no indication that any attempt was made to integrate the depressed economic state of the electronic industry into his report; although the "formula" approach was used to determine the value of intangibles, there is no indication that better evidence was not available from which the value of intangibles could be determined (See Revenue Ruling *201 68-609); although defendant's interest is a minority interest, and although it appears that ESC's financial health depends on the efforts of one man, there is no discussion as to whether discounts would be appropriate; no attempt was made to ascertain the actual market value of the fixed assets; no attempt was made to evaluate the reasonableness or excessiveness of the officers' salaries and no attempt was made to explain how the percentage rates of return or the capitalization factors were derived.
It has been stated that to be effective
* * * an expert should not only state his conclusions but indicate that he has checked them against the results reached by other methods and establish that they rest on the broadest possible variety and combination of available valuation methods, bearing in mind the peculiarities of the particular stock to be valued. [Kascle, Valuation of Closely Held Corporations, supra at 458]
Because of the incompleteness of the information upon which plaintiff's expert based his opinion, and because of the absence of any reasoned analysis of this corporation's fair market value, his value of the corporation is far too high.
Allen R. Freedman testified on behalf of defendant. Freedman is an attorney who is the executive vice-president of a firm that serves as a consultant to small and medium-sized industrial concerns. Freedman testified that he has provided appraisal services for the electronic and computer industries.
Freedman testified that in the preparation of his report (in evidence) he sought to ascertain and analyze the factors suggested in Revenue Ruling 59-60. Among other things, he examined the company's financial reports, ascertained the economic outlook for the company and for the industry in which the company functions, and determined the financial condition of the company for the previous five years.
Freedman notes in his report that "during 1974 the U.S. economy underwent the start of its most severe postwar recession," which resulted in a marked "downturn in economic *202 fortunes from which the country did not recover until late 1975 early 1976." During this period of time the electronics industry in particular was suffering severe earning declines, which made it extremely difficult to obtain any form of new equity financing during 1974. Freedman also compares ESC to like companies engaged in the manufacture of capacitors during this period.
Freedman evaluated ESC from three viewpoints: (1) based upon the value of its assets, (2) based upon its value as a going concern and (3) based upon private transactions. His conclusion was that the value of ESC as of October 11, 1974 was $75,000.
Freedman correctly used the approach to valuation set forth in Revenue Ruling 59-60. He made adjustments to accounts where close examination reveals the necessity of an appropriate adjustment. His testimony is credible.
Based upon all relevant factors, in particular the economic outlook of the country and of the electronics industry at that time; based upon an analysis of like companies which were in the business of manufacturing capacitors; based upon an exaggerated inventory, and finally, based upon what is perceived as a severe cash flow problem on the part of ESC, the fair market value of ESC in October 1975 was $75,000. It would not be appropriate to discount defendant's interest in the corporation, notwithstanding the fact that he has only a minority interest. Cf. Williams, "Valuation of Closely-Held Corporations," 110 Trusts and Estates, 184 188 (January 1971); Lawinger, "Appraising Closely Held Stock  Valuation Methods and Concepts," supra at 873. The value of defendant's interest in ESC is $32,100.
Defendant's interest in ESC is an asset that is subject to equitable distribution. After application of the criteria set forth in Painter v. Painter, 65 N.J. 196, 211 (1974), plaintiff is entitled to a one-half share of that asset. Therefore plaintiff is due $16,050 by way of equitable distribution of defendant's interest in the closely held corporation. After consideration of defendant's financial liquidity, *203 it is the determination of this court that defendant shall make payment of the sum of money found to be due plaintiff by way of equitable distribution by or before December 1, 1978. At this time collateral will not be required to secure the payment. If there is default in the payment of the amount due, plaintiff will be free to apply for appropriate relief.
Consideration must be given to the fact that support payments are intimately related to equitable distribution and the financial security and potential income available because of it. Esposito v. Esposito, 158 N.J. Super. 285 (App. Div. 1978); Smith v. Smith, 72 N.J. 350 (1976). As a result of the equitable distribution plaintiff will have available a substantial capital fund to invest in order to produce additional income. Moreover, this is not a situation where the marriage is one of extremely long duration, nor one in which plaintiff has geared her whole life style to rearing a family. Here plaintiff has the potential capacity to support herself in part by becoming employed. Cf. Khalaf v. Khalaf, 58 N.J. 63, 69-70 (1971). See also, Turner v. Turner, 158 N.J. Super. 313 (Chan. Div. 1978). In view of that fact, the amount of support which defendant will be required to pay plaintiff each month will be reduced to $400.
The reduction in support shall take effect and commence with the first monthly payment subsequent to when plaintiff's share of equitable distribution is paid in full.

III. Counsel Fees.

The third issue remanded by the Appellate Division for reconsideration is that of attorney fees.
The general rule with respect to counsel fees is that while an award of counsel fees to the wife is discretionary, nevertheless some reasonable award should be made if there is demonstration of the wife's need, the husband's ability, and the wife's good faith in instituting the action. Williams v. Williams, 59 N.J. 229, 233 (1971).
*204 In order to come to a determination on the issue of attorney fees, it will first be necessary to examine the respective assets and liabilities of the parties.
[The court reviewed the financial condition of the parties and directed that defendant pay $7,500 as counsel fee, costs and trial expenses to plaintiff's attorney.]