734 A.2d 738

LAWSON MARDON WHEATON, INC., FORMERLY KNOWN AS WHEATON INC., FORMERLY KNOWN AS WHEATON INDUSTRIES, PLAINTIFF–RESPONDENT, v. DOUGLAS FREDERICK SMITH, A/K/A DOUGLAS F. SMITH AND ANTHONY D. SMITH, TRUSTEE FOR DOUGLAS FREDERICK SMITH, DEFENDANTS, AND SUSAN HUFFARD BALL, P. PHILLIPPI HUFFARD, IV, TREVOR LANSING HUFFARD, WHITNEY LANCASTER HUFFARD, COURTNEY MONTAGU HUFFARD, ROBERT D. ROBERTSON, A/K/A ROBERT SHAW, FRANK H. WHEATON, III, CUSTODIAN FOR AMANDA ELIZABETH WHEATON, FRANK H. WHEATON, III, FRANK H. WHEATON, III, CUSTO-

DIAN FOR CHRISTOPHER BAINBRIDGE WHEATON, ADA A. STRASENBURGH, JAMES A. STRASENBURGH, JOHN B. STRASENBURGH, JOHN GRIFFIN STRASENBURGH, JOHN B. STRASENBURGH, TRUSTEE FOR JOHN GRIFFIN STRASEN-BURGH, JR., JOHN B. STRASENBURGH, TRUSTEE FOR BLAIR BALDWIN STRASENBURGH, LOUISE HOUGHTON STRASENBURGH, JOHN B. STRASENBURGH, TRUSTEE FOR SARAH HOUGHTON STRASENBURGH, JOHN B. STRASEN-BURGH, TRUSTEE FOR TOBY E. A. STRASENBURGH, SALLY STRASENBURGH APPLEGATE LANE, JOHN B. STRASEN-BURGH, TRUSTEE FOR SAMUEL CHURCH APPLEGATE, JOHN B. STRASENBURGH, TRUSTEE FOR AMOS EIGHMY APPLEGATE, JOHN B. STRASENBURGH, TRUSTEE FOR GEORGE GUTHRIE APPLEGATE, JOHN B. STRASENBURGH, TRUSTEE FOR ALLISON WEBB STRASENBURGH AND JOHN B. STRASENBURGH, TRUSTEE FOR OLIVER JAMES STRA-SENBURGH, DEFENDANTS–APPELLANTS.

Argued May 3, 1999—Decided July 14, 1999.

*Frederick L. Whitmer,* argued the cause for appellants Susan Huffard Ball, P. Phillippi Huffard, IV, Trevor Lansing Huffard, Whitney Lancaster Huffard, Courtney Montagu Huffard, Ada A. Strasenburgh, James A. Strasenburgh, John B. Strasenburgh, John Griffin Strasenburgh, John B. Strasenburgh, Trustee for John Griffin Strasenburgh, Jr., John B. Strasenburgh, Trustee for Blair Baldwin Strasenburgh, Louise Houghton Strasenburgh, John B. Strasenburgh, Trustee for Sarah Houghton Strasenburgh, John B. Strasenburgh, Trustee for Toby E.A. Strasenburgh, Sally Strasenburgh Applegate Lane, John B. Strasenburgh, Trustee for Samuel Church Applegate, John B. Strasenburgh, Trustee for Amos Eighmy Applegate, John B. Strasenburgh, Trustee for George Guthrie Applegate, John B. Strasenburgh, Trustee for Allison Webb Strasenburgh, and John B. Strasenburgh, Trustee for Oliver James Strasenburgh (*Pitney, Hardin, Kipp & Szuch,* attorneys; *Mr. Whitmer* and *Thomas R. Hower,* on the briefs).

*Marc J. Sonnenfeld,* a member of the Pennsylvania, Massachusetts, Florida and District of Columbia bars, argued the cause for appellants Robert D. Robertson, a/k/a Robert Shaw, Frank H. Wheaton, III, Custodian for Amanda Elizabeth Wheaton, Frank

H. Wheaton, III, and Frank H. Wheaton, III, Custodian for Christopher Bainbridge Wheaton (*Morgan, Lewis & Bockius,* attorneys; *Robert A. White,* on the briefs).

*Jesse A. Finkelstein,* a member of the Delaware bar, argued the cause for respondent (*Kenney & Kearney,* attorneys; *Mr. Finkelstein, Joseph H. Kenney,* and *Allen A. Etish,* on the brief).

The opinion of the Court was delivered by

GARIBALDI, J.

In this appeal, we consider how a court in a statutory appraisal action should determine the "fair value" of the shares of stock held by dissenting shareholders in a family-held corporation. Specifically, in calculating "fair value" should the court apply a discount reflecting the lack of marketability or non-marketability of those shares ("marketability discount"). We also determine whether the "extraordinary circumstances test" set forth in 2 ALI, *Principles of Corporate Governance: Analysis and Recommendations,* ¶ 7.22(a), at 302; comment e to ¶ 7.22, at 313 (1994) (2 *ALI Principles* ) is applicable, and whether the trial court should have reopened the record to consider the effect of a subsequent merger when calculating the "fair value" of the stock.

## I.

This appeal arises out of a dispute over the management of a family business that began as a one-man glass works and evolved into a multi-national corporation that manufactures glass, plastics and scientific equipment. *Strasenburgh v. Straubmuller,* 146 *N.J.* 527, 531–32, 683 *A.*2d 818 (1996). Lawson Mardon Wheaton, Inc., formerly Wheaton, Inc. (Wheaton or the Company) was founded in 1888 by Dr. Theodore C. Wheaton. Until December 1991, the company was a privately-held, family-controlled business, governed by a Board of three directors, each of whom represented one of the three branches of the Wheaton family. In 1996, the company was sold to Alusuisse–Lonza Holding Ltd., (Alusuisse), a Swiss holding company.

Until 1991, Wheaton stock was one hundred percent family owned. The Board of Directors consisted of Frank H. Wheaton, Jr., Edward C. Wheaton, and George Straubmuller, the descendants of Dr. Wheaton's three children. Over the years, the presidency of the Company had passed from the founder's eldest son, down to his eldest son, and so on, until Frank H. Wheaton, Jr. became President. In March 1990, Frank H. Wheaton, Jr., the long-time President of Wheaton, resigned amidst controversy. In January 1991, under pressure from the other directors, he took a leave of absence as Chairman of the Board of Directors. Later that year, the Board failed to renominate him and he was forced out as a director of the Company. Robert Veghte, a member of the Straubmuller branch of the Wheaton family, was appointed President and Chief Executive Officer of Wheaton. By 1991, no member of the Frank H. Wheaton, Jr. branch of the family was employed by the Company and one branch of the Straubmuller branch, the Strasenburghs, were not employed by the Company.

When he was forced out of the Company in 1991, Frank H. Wheaton, Jr. sold 100,000 shares of his stock to a British company, Bowater PLC, for $64.00 per share. In August 1991, Bowater secured option agreements to purchase an additional 17.7 percent of Wheaton stock at $64.00 per share. Bowater also made a conditional offer to management to buy all the Company's stock at $64.00 per share.

Although Bowater's negotiators were authorized to pay up to $70.00 a share, the Company believed the stock was worth more. Therefore, on August 28, 1991, the Wheaton Board of Directors rejected the Bowater offer and unanimously adopted a resolution stating that the Company was not for sale. On that same day, seventy-one percent of the Wheaton shareholders approved a "Shareholder Liquidity Plan" and a voting trust, restricting any further sales of Wheaton stock outside the family unless approved by seventy-five percent of the shareholders and five of six members of a shareholder committee.

In November 1991, in an attempt to further restrict future public sales of Wheaton stock, the controlling family members approved a plan to restructure the corporation. Under the plan, Wheaton would transfer substantially all of the company assets to three newly-created, wholly-owned subsidiaries in exchange for all of the subsidiaries' capital stock. The new stock consisted of two classes: Class "A" stock, which could not be sold to anyone outside the family; and Class "B" stock, which could be sold freely, but only carried one vote to Class A stock's ten votes.

On December 6, 1991, the Company formally announced the restructuring. It advised shareholders who did not approve of the plan that they had a right to dissent from the corporate action and demand payment of the "fair value" of their shares under *N.J.S.A.* 14A:11–1 to –11 (Appraisal Statute) of the New Jersey Business Corporation Act, (BCA), *N.J.S.A.* 14A:1–1 to –16–4.[1] Twenty-six shareholders,[2] owning approximately fifteen percent of Wheaton's stock (the dissenters),[3] formally dissented from the plan and demanded fair value payment for their shares pursuant to the appraisal statute.

In late January 1992, Wheaton retained First Boston, Inc. (First Boston), an investment banking firm, to prepare a fair value appraisal of the Company. First Boston computed a fair value

---

[1] For convenience, we sometimes use shorthand references to the sections and subsections of the BCA as, for example, 11–4(2).

[2] All twenty-six of the shareholders who dissented are either descendants of Frank H. Wheaton, Jr. or Ada Anderson Strasenburgh.

[3] Originally there were twenty-six dissenters, pursuing the litigation in two groups. Frank H. Wheaton, III, Douglas Frederick Smith, Anthony Smith, and Robert W. Shaw comprised one group. All other dissenters comprised the second group.

Two from the first group, Douglas and Anthony Smith, subsequently moved in the trial court to dismiss the appraisal action as to them, to restore their status as shareholders, and to receive the $63.00 per share payment from the acquisition merger with Alusuisse. The court granted their motion on January 29, 1997. A third member of the first group, Robert W. Shaw, joins Frank H. Wheaton, III in his petition to this Court.

range between $39.49 and $42.53 per share. First Boston arrived at this range by calculating a fair trading value range of $52.65 to $56.70 per share and then applying what it viewed to be a minimum non-marketability discount of twenty-five percent. The company ultimately offered the dissenting shareholders $41.50 per share. Wheaton's Chairman testified that the Company made an offer in the upper range since they were all family. The dissenters rejected the offer and in April 1992, the Company initiated the present appraisal action in the Chancery Division.

In June 1995, three years later and two months before trial was to begin, the Company voted to rescind the 1991 corporate restructuring that had triggered the dissenting stockholders' appraisal rights. Wheaton then moved to dismiss the appraisal action (rescission motion). The Chancery Division denied that motion, and the Appellate Division denied leave to appeal. During the course of trial, Wheaton appealed the Appellate Division decision to this Court.

Meanwhile, as the trial was proceeding, the Legislature amended the BCA. The type of corporate restructuring that Wheaton undertook, an intracorporate transfer of assets from a parent corporation to wholly-owned subsidiaries, would no longer trigger dissent and appraisal rights. *N.J.S.A.* 14A:10–11(4), 11–1(1)(b) (as amended by *L.* 1995, *c.* 279, § 16, § 21, eff. Dec. 15, 1995). Shortly after the new law became effective, Wheaton renewed its motion to dismiss the appraisal action. It contended that the amendments applied retroactively, thereby terminating the dissenting shareholders' rights to the fair value of their stock (retroactivity motion). The trial court denied the motion and continued taking testimony in the appraisal action until its conclusion on February 26, 1996.

On April 24, 1996, we granted Wheaton's motion for leave to appeal the denial of the rescission motion and granted Wheaton's motion for direct review of the denial of the retroactivity motion. That case was argued before this Court on April 29, 1996. One

day later on May 1, 1996, Wheaton announced "an acquisition merger" with Alusuisse, effective April 29, 1996.

Under the merger, Wheaton shareholders would receive $63.00 per share for their Wheaton stock. Alusuisse also asked Wheaton's counsel to withdraw its appeal in the appraisal matter. We observed that the "decision to withdraw the appeals undoubtedly stem[med] from Alusuisse–Lonza's belief that the fair value of the shares when surrendered in 1991 was lower than the 1996 acquisition price of $63.00." *Strasenburgh, supra,* 146 *N.J.* at 537, 683 *A.*2d 818.

We affirmed the trial courts' rulings on the rescission and retroactivity motions. *Id.* at 545, 683 *A.*2d 818.[4] We remanded the case to the Chancery Division to determine the "fair value" of the dissenters' stock, directing "the trial court . . . in its discretion to reopen the record in the appraisal proceedings for consideration of events that have transpired since the hearing closed." *Ibid.*

## II.

### A.

During the original appraisal action in 1995, the court heard testimony from the parties' respective valuation experts: George Weiksner, a managing director and Chairman of First Boston's investment banking committee, testified on Wheaton's behalf; Mark Lee, managing director of Bear Stearns and Co., Inc.'s investment banking department, testified on the dissenters' behalf.

---

4 In January 1992, twenty of the dissenters had filed a separate action against Wheaton's board of directors alleging that the directors abused their positions by misappropriating corporate assets and opportunities, misusing company funds, and deflating the value of the company stock, which the trial court dismissed. *Strasenburgh v. Straubmuller,* 284 *N.J.Super.* 168, 664 *A.*2d 497 (App.Div.1995). The Appellate Division reversed that dismissal in August 1995, and this Court granted a petition for certification to appeal the reversal. Subsequently, we granted defendants' motion to dismiss the complaint in the shareholders' action on the ground that the shareholders' claims, if valid, were derivative, not direct claims. *Strasenburgh, supra,* 146 *N.J.* at 533, 683 *A.*2d 818.

As the courts below recognized, both experts used essentially the same methodology in determining the "liquid" or "free trading value" of Wheaton's stock.[5]  Both experts analyzed and compared Wheaton's financial data with that of five comparable public companies to impute a multiple or price/earnings ratio for Wheaton.  Both arrived at a price earnings ratio of about 13.5 times earnings.  Both then multiplied that ratio by their estimate of Wheaton's 1992 earnings per share to determine the price per share.  Both experts selected the same five companies for analysis and comparison, although the dissenters' expert used an additional two.  Both agreed that The West Company, Inc. was most similar to Wheaton.

The experts, however, disagreed on two major points.  First, the experts disagreed on the projected earnings calculation.  The dissenters' expert accepted and applied Wheaton's 1992 projected earnings estimate of $23.8 million; Weiksner reduced that projection to $20.5 million to account for the Company's failure to meet its projections in previous years.  The trial court accepted the reduction, termed "the haircut," because it "lacked confidence" in Wheaton's projections and believed Weiksner's estimate was more consistent with previous actual earnings.  The dissenters have not pursued that issue.

The second area of contention, and the primary issue in the case, is the applicability of a "marketability discount" to the liquid traded value range.  As stated in its report to Wheaton, First Boston determined the fair value of the dissenters' stock as follows:

Based upon the trading multiples of the comparable companies, the historical and financial performance of Wheaton versus the comparables, and taking into account the factors affecting value delineated above, First Boston estimated the liquid trading range for Wheaton common stock on December 5 to be 13.0x–14, or $52.65 to $56.70 per share.  To reflect that Wheaton is a private company without a readily accessible liquid trading market, First Boston then applied a twenty-five percent discount of $13.16 to $14.17, and an additional five percent discount due to

---

[5] These terms were used interchangeably by the experts to mean the theoretical price a share of Wheaton stock would bring in the open market.

the Company's share ownership, restrictions on stock transfers, and control issues, or an additional discount of $2.63 to $2.84. First Boston believed the fair value of the shares, taking into account those discounts, is $36.86 to $39.69.

Bear, Stearns declined to apply a marketability discount, concluding that the pro rata equity valuation method was more appropriate to determine the fair value of Wheaton's stock. Under that method, the corporation is valued as an entity. The company's equity value is then allocated in proportion to each shareholders' interest. Lee, relying on Delaware courts' approach in appraisal actions, concluded that the pro rata method is more appropriate because it treats shareholders equally and awards them the full proportionate value of their shares. He arrived at a fair value of $67.00 to $75.00 per share.

## B.

The trial court concluded that a marketability discount was applicable under the facts of this case. Initially, the court noted that "fair value" is a flexible standard dependent on the circumstances and context of a transaction. 2 *ALI Principles, supra,* comment d to ¶ 7.22, at 306. There is no single or universal method to determine "fair value." *Ibid.* The court further observed that the parties agreed on how to calculate the going concern value and that jurisdictions are split on whether marketability discounts are appropriate. Although declining to decide whether a marketability discount should be applied as a general rule in New Jersey, the court concluded that "extraordinary circumstances" were present, mandating application of the marketability discount in this case. *See* 2 *ALI Principles,* ¶ 7.22(a), at 302; comment e to ¶ 7.22, at 312 (stating that marketability discount is appropriate only in "extraordinary circumstances"). The court believed the dissenters "exploited a change they themselves championed and possibly prevented an IPO, (initial public offering) to the detriment of other shareholders." That constituted an extraordinary circumstance warranting application of the marketability discount.

The court applied a twenty-five percent marketability discount, concluding that the fair value of a share of Wheaton stock on the December 5, 1991 valuation date was $41.05. The court arrived at that number by multiplying 13.5, the average multiple used by the experts, by $20.5 million, the 1992 projected earnings after the "haircut." The court then divided that product by 5.057 million, the number of shares outstanding on December 5, 1991, yielding a value of $54.73 per share. The court then subtracted twenty-five percent of the value for nonmarketability, yielding $41.05 per share.

Although the court refused to reopen the record to consider the Alusuisse merger, it did consider such factors as the general level of the stock market on the valuation date. The court also found that the dissenters were entitled to simple interest of 8.24%, calculated from the date of the dissenting shareholders demand for payment, N.J.S.A. 14A:11–9(2), reduced by a credit reflecting the amount of aggregate advancements made during the pendency of the litigation.[6] The trial court found no issue of oppression, the attorneys not having raised it.

## C.

The dissenters appealed, and the Appellate Division affirmed the trial court. *Lawson Mardon Wheaton, Inc. v. Smith*, 315 *N.J.Super.* 32, 716 *A.2d* 550 (1998) (hereinafter referred to as *Wheaton*). The Appellate Division concluded that the propriety of applying a discount or premium to the base valuation reached by a lower court is a question of law for the reviewing court to decide *de novo*. *Id.* at 55, 716 *A.2d* 550. Since the principally contested issues involved the propriety of the discounts, the panel reviewed the case *de novo*.

---

[6] In May 1992, the trial court entered an order that entitled the dissenters to receive funds from the Company on a quarterly basis. Treating the advancements as a prepayment of interest, the court decided that the amounts advanced should equal any dividends actually paid to the non-dissenting Wheaton stockholders.

The Appellate Division observed that courts and commentators are divided on the question of whether to apply a marketability discount and that "the weight of authority is against applying the discount." *Id.* at 59, 716 *A.*2d 550; *see also id.* at 59–61, 716 *A.*2d 550. "[C]ase law and commentators reject[ ] application of the marketability discount when shares are acquired by the corporation . . ." and "marketability discounts have been viewed as especially inapplicable to intra-family transfers in closely-held companies, as in this case." *Id.* at 60, 716 *A.*2d 550.

After making those observations, the court nevertheless accorded great deference to the trial court's findings of fact. The panel found that the record supported the court's conclusions that "the dissenters seized upon a non-material corporate restructuring to trigger an appraisal remedy." The panel agreed "that [the dissenters'] actions and motives for their actions comport[ed] with the extraordinary circumstances contemplated by the § 7.22(a) exception." *Id.* at 66–67, 716 *A.*2d 550. The panel also concluded that the trial court did not abuse its discretion by refusing to reopen the record to consider the Alusuisse merger. *Id.* at 43–45, 716 *A.*2d 550. Thus, the Appellate Division affirmed the trial court in all respects.

The dissenters filed petitions for certification, posing the two following questions: did the courts below err, (i) in applying the marketability discount to determine the fair value of the dissenters' stock; and (ii) in not reopening the record solely to consider evidence of the Alusuisse merger. We granted the dissenters' petitions of certification. 158 *N.J.* 73, 726 *A.*2d 937 (1999).

### III.

*N.J.S.A.* 14A:11–3, of the Appraisal Statute, reads in pertinent part:

(1) A shareholder who has made demand for the payment of his shares in the manner prescribed by subsection 14A:11–2(3), 14A:11–2(4) or 14A:11–2(5) is hereafter in this Chapter referred to as a "dissenting shareholder."

(2) Upon making such demand, the dissenting shareholder shall cease to have any of the rights of a shareholder except the right to be paid the fair value of his shares and any other rights of a dissenting shareholder under this Chapter.

(3) "Fair value" as used in this Chapter shall be determined

(a) As of the day prior to the day of the meeting of shareholders at which the proposed action was approved or as of the day prior to the day specified by the corporation for the tabulation of consents to such action if no meeting of shareholders was held....

....

....

In all cases, "fair value" shall exclude any appreciation or depreciation resulting from the proposed action.

[*N.J.S.A.* 14A:11-3.]

Historically, corporations could act only with the unanimous consent of all shareholders. That rule protected minority stockholders by giving them an effective veto power over the will of the majority. However, it frequently led to deadlock and corporate paralysis. To promote the flexibility needed by modern corporations, an alternative was adopted. Unanimity was traded for "majority rule" and veto power exchanged for appraisal rights. Minority owners could no longer stop their company from pursuing a course with which they disagreed. But they did not have to go along. They had the right to demand to be bought out by the company at "fair value." 1 John R. MacKay II, *New Jersey Business Corporations,* ¶ 9–10(a) (2d ed.1996) (citations omitted); Barry M. Wertheimer, *The Shareholders' Appraisal Remedy and How Courts Determine Fair Value,* 47 *Duke L.J.* 613, 618–26 (1998).

"Fair value," as used in the Appraisal Statute, as well as in the Oppressed Shareholder Statute, is not defined.[7] Until the adoption of the BCA in 1968, New Jersey required dissenters in appraisal actions to be paid the "full market value" of their shares. The New Jersey Corporation Law Revision Commission

---

[7] "Fair Value" as used in *N.J.S.A.* 14A:12–7, the Oppressed Shareholder Statute addressed in *Balsamides v. Protameen Chemicals, Inc.,* 160 *N.J.* 352, 734 A.2d 721 (1999), also decided today.

> abandoned the more restrictive standard of "full market value" used in Title 14 [of the Revised Statutes, the pre–1968 corporate law], in favor of the broader and more flexible test of "fair value" found in the [ABA's] Model [Business Corporation] Act. In most cases the shares to be appraised will not be readily marketable. . . .
>
> [1968 Commissioners' Comment to *N.J.S.A.* 14A:11–3.]

Even though "fair value" is not synonymous with "fair market value,"[8] consideration of market price still can be a "valuable corroborative tool." *Dermody v. Sticco,* 191 *N.J.Super.* 192, 199, 465 *A.*2d 948 (Ch.Div.1983).

There is no inflexible test for determining fair value, as "[v]aluation is an art rather than a science." Wertheimer, *supra,* 47 *Duke L.J.* at 629. Since the Delaware case of *Weinberger v. UOP, Inc.,* 457 *A.*2d 701 (Del.1983), *rev'g,* 426 *A.*2d 1333 (Del.Ch.1981), courts and commentators have come to agree that "an assessment of fair value requires consideration of 'proof of value by any techniques or methods which are generally acceptable in the financial community and otherwise admissible in court.'" 1 MacKay, *supra,* ¶ 9–10(c)(1) (citing *Dermody supra,* 191 *N.J.Super.* at 196, 465 *A.*2d 948) (quoting *Weinberger, supra,* 457 *A.*2d at 713) (rejecting old block method of valuing stock and adopting approach that uses generally accepted techniques employed by financial community). That approach also is recommended by the ALI. 2 *ALI Principles,* comment d to ¶ 7.22, at 305–06 (stating that no single or universal standard of fair value should be applied in all contexts).

## A.

The parties in this case agree about the basic technique to be used in determining fair value. The parties, as in most dissenters' rights cases, however, disagree about whether the fair value to be

---

[8] "Fair market value" is defined as "the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts." Rev. Rul. 59–60, 1959–1 C.B. 237.

paid to a dissenting shareholder should reflect a minority or marketability discount. *See* 1 MacKay, *supra,* ¶ 9–10(c)(1).

▮ Initially, we must decide what standard of review applies to the trial court's use of a marketability discount. A trial court's findings are entitled to great deference and will be overturned only if the trial court abuses that discretion. *Rova Farms Resort Inc. v. Investors Ins. Co.,* 65 *N.J.* 474, 483–84, 323 *A.*2d 495 (1974). Matters of law, on the other hand, are subject to *de novo* review.

▮ In analyzing corporate law issues, we find Delaware law to be helpful. *Wheaton, supra,* 315 *N.J.Super.* at 61, 716 *A.*2d 550; *Pogostin v. Leighton,* 216 *N.J.Super.* 363, 373, 523 *A.*2d 1078 (App.Div.), *certif. denied,* 108 *N.J.* 583, 531 *A.*2d 1356, *cert. denied* 484 *U.S.* 964, 108 *S.Ct.* 454, 98 *L.Ed.*2d 394 (1987). In *Rapid-American Corp. v. Harris,* 603 *A.*2d 796, 804–05 (Del.1992), the Delaware Supreme Court held that the question of whether to add a "control premium" to the publicly-traded equity value of a company involved a question of law. The court reviewed the trial court's refusal to apply the premium *de novo*. The question of whether to apply a "marketability discount" is analogous to the "control premium" issue. Because it implicates a question of law, it also is subject to *de novo* review. *Wheaton, supra,* 315 *N.J.Super.* at 54–55, 716 *A.*2d 550; *Balsamides v. Perle,* 313 *N.J.Super.* 7, 26, 712 *A.*2d 673 (App.Div.1998).

Before exploring the issue of marketability discounts, it is useful to understand the distinction between a marketability discount and a minority discount. Some courts confuse those terms. A minority discount adjusts for lack of control over the business entity on the theory that non-controlling shares of stock are not worth their proportionate share of the firm's value because they lack voting power to control corporate actions. Edwin T. Hood et al., *Valuation of Closely Held Business Interests,* 65 *UMKC L.Rev.* 399, 438 (1997); *see also* 2 *ALI Principles,* comment e to ¶ 7.22, at 311; *Wheaton, supra,* 315 *N.J.Super.* at 56, 716 *A.*2d 550 (citations omitted). A marketability discount adjusts for a lack of liquidity in one's interest in an entity, on the theory that there is a

limited supply of potential buyers for stock in a closely-held corporation. Hood, *supra*, 65 *UMKC L.Rev.* at 438; *see also, Wheaton, supra*, 315 *N.J.Super.* at 56, 716 *A.*2d 550 (citations omitted). Even controlling interests in nonpublic companies may be eligible for marketability discounts, as the inability to convert the stock interest into cash applies regardless of control. James Edward Harris, *Valuation of Closely–Held Partnerships and Corporations: Recent Developments Concerning Minority Interest and Lack of Marketability Discounts*, 42 *Ark. L.Rev.* 649, 660 (1989).

Aside from the lower courts' opinions in the present case and in *Balsamides, supra*, 160 *N.J.* 352, 734 *A.*2d 721, few New Jersey cases have addressed the issue of stock discounts. Of the cases that have, the issue was presented in the course of valuing stock for tax or equitable distribution purposes. *See Tracy v. Alexander*, 17 *N.J.* 397, 405, 111 *A.*2d 492 (1955) (applying minority discount when valuing minority stock interest for transfer inheritance tax purposes); *In re Estate of Post*, 282 *N.J.Super.* 59, 77–78, 659 *A.*2d 500 (App.Div.1995) (refusing to apply minority discount where liquidation approach was used to value decedent's interest in corporation for elective share purposes); *Lavene v. Lavene*, 162 *N.J.Super.* 187, 202, 392 *A.*2d 621 (Ch.Div.1978) (finding it inappropriate to apply discount to reflect husband's minority interest in closely-held corporation for equitable distribution purposes). Those cases, however, are of limited assistance. *See* 2 *ALI Principles*, comment e to ¶ 7.22, at 312 (stating that valuation principles appropriate for appraisal actions are not necessarily useful in other contexts, such as stock valuation for tax and equitable distribution purposes).

"The valuation principles adopted by ¶ 7.22 are those that are appropriate for appraisal." *Ibid.* (noting that discounts attributable to minority status or non-marketability are not necessarily inappropriate). Although there is no universal method for valuing stock, courts should be mindful that "[t]he standard of valuation employed in any given context should reflect the purpose served

by the law in that context...." *Ibid.* Each situation presents different elements of value which must be weighted and analyzed accordingly. *See Dreiseszun v. FLM Industries, Inc.,* 577 *S.W.*2d 902, 907 (Mo.App.1979) (holding that there is no simple formula for determining "fair value" of corporate stock in appraisal actions; each case presents different elements of value).

■ New Jersey's statute providing for appraisal of dissenting shareholders' shares "is designed to afford a simple and expeditious remedy to the dissenting shareholder...." *Bache & Co. v. General Instrument Corp.,* 42 *N.J.* 44, 51, 198 *A.*2d 759 (1964).

> The appraisal remedy today serves a minority shareholder protection role, sometimes providing liquidity to shareholders, but most often operating to protect minority shareholders who are cashed out of their investment. The remedy fulfills this function ex ante, deterring insiders from engaging in wrongful transactions, and ex post, providing a remedy to minority shareholders who are subjected to such transactions.
>
> [Wertheimer, *supra,* 47 *Duke L.J.* at 615–16 (citations omitted).]

Accordingly, the statute should be liberally construed in favor of the dissenting shareholders. *Jaquith & Co. v. Island Creek Coal Co.,* 47 *N.J.* 111, 114, 219 *A.*2d 514 (1966) (reaffirming policy that statute is to be liberally construed in favor of dissenting shareholders); *Bache, supra,* 42 *N.J.* at 51, 198 *A.*2d 759.

### B.

■ The very nature of the term "fair value" suggests that courts must take fairness and equity into account in deciding whether to apply a discount to the value of the dissenting shareholders' stock in an appraisal action. *See N.J.S.A.* 14A:12–7(8)(a) (authorizing court to adjust, as it deems equitable, the fair value of corporation in case of "oppression"—fraud, illegality, mismanagement). *See also* 2 John R. MacKay II, *New Jersey Business Corporations,* § 14.6(d)(2)(e) (2d ed.1992) (noting that "[f]air value may be adjusted to the extent the court deems equitable if the action was brought on account of oppression [*N.J.S.A.* 14A:12–7(1)(c) ]—as opposed to deadlock"). There is no reason to believe that "fair value" means something different when addressed to

dissenting shareholders (*N.J.S.A.* 14:11) than it does in the context of oppressed shareholders (*N.J.S.A.* 14:12). 2 MacKay, *supra*, § 14–6(d)(2)(e).

Indeed, equitable considerations have led the majority of states and commentators to conclude that marketability and minority discounts should not be applied when determining the fair value of dissenting shareholders' stock in an appraisal action. Although there is no clear consensus,

> [t]he use of a *fair value* standard, combined with the application of equitable principles, has resulted in a majority of jurisdictions holding that a dissenting shareholder is entitled to her proportional share of the fair market value of the corporation. The value of the shares will not be discounted on the ground that the shares are a minority interest or on the related grounds of a lack of liquidity or marketability. (citing cases agreeing, disagreeing and leaving decision to trial court's discretion).
>
> [1 MacKay, *supra*, ¶ 9–10(c)(2) ].

*See also* 2 *ALI Principles*, ¶ 7.22(a), at 302 (stating that in corporate transactions giving rise to appraisal rights, fair value of shares should measure value of shareholder's "proportionate interest in the corporation, without any discount for minority status or, absent extraordinary circumstances, lack of marketability"); Wertheimer, *supra*, 47 *Duke L.J.* at 648 (explaining why neither marketability nor minority discount should be applied in appraisal actions).

Courts rejecting the discount have concluded that it injects speculation into the appraisal process, fails to give the minority shareholder the full proportionate value of his shares, and encourages corporate squeeze-outs. 1 MacKay, *supra*, ¶ 9–10(c)(2); *Cavalier Oil Co. v. Harnett*, 564 A.2d 1137, 1145 (Del.1989); *In re Valuation of Common Stock of McLoon Oil Co.*, 565 A.2d 997, 1004–05 (Me.1989) (*In re McLoon* ). Other commentators, however, believe that marketability discounts are appropriate in appraising dissenters' shares since they compensate for the high risks inherent in small family-owned businesses or for the lack of liquidity caused by the limited pool of buyers. *See* Harris, *supra*, 42 *Ark. L.Rev.* at 657; *Columbia Management Co. v. Wyss*, 94 *Or.App.* 195, 765 *P.2d* 207, 213–14 (1988), *review denied*, 307 *Or.*

571, 771 *P*.2d 1021 (1989) (holding marketability discount was properly applied, but it was error to apply minority discount as well). "[A] respectable minority of states, including Ohio, Indiana, and Kansas accept the view that a minority discount is appropriate in valuing shares in a dissenters' rights proceedings." 1 MacKay, *supra,* ¶ 9–10(c)(2) (citations omitted).

■ We find most persuasive those cases holding that marketability discounts should not be applied in determining the "fair value" of a dissenting shareholder's share in an appraisal action. The appraisal remedy originally was viewed as a solution to the potential gridlock problems of corporate unanimity. *Dreiseszun,* 577 *S.W.*2d at 907–08. A rule that imposes a discount on the exiting dissenting shareholder "fail[s] to accord to a minority shareholder the full proportionate value of his shares ... [and] enriches the majority shareholder who may reap a windfall from the appraisal process by cashing out a dissenting shareholder...." *Cavalier, supra,* 564 *A*.2d at 1145. Such a rule also penalizes the minority for taking advantage of the protection afforded by the appraisal statute. *Dreiseszun, supra,* 577 *S.W.*2d at 907–08. "Any rule of law that [gives] the shareholders less than their proportionate share of the whole firm's fair value would produce a transfer of wealth from the minority shareholders to the shareholders in control. Such a rule [also] would inevitably encourage corporate squeeze-outs[,]" *In re McLoon, supra,* 565 *A*.2d at 1005, and is contrary to the purpose of the appraisal statute. *MT Properties, Inc. v. CMC Real Estate Corp.,* 481 *N.W.*2d 383, 387 (Minn.Ct.App.1992). Those results are clearly undesirable.

The history and policies behind dissenters' rights and appraisal statutes lead us to conclude that marketability discounts generally should not be applied when determining the "fair value" of dissenters' shares in a statutory appraisal action. Of course, there may be situations where equity compels another result. Those situations are best resolved by resort to the "extraordinary circumstances" exception in 2 *ALI Principles,* ¶ 7.22(a).

## IV.

■ The Chancery Division and Appellate Division found that the present case falls within the "extraordinary circumstances" exception to the general prohibition against applying a marketability discount. We disagree.

*2 ALI Principles,* ¶ 7.22(a), at 302 states:

(a) The fair value of shares under § 7.21 (Corporate Transactions Giving Rise to Appraisal Rights) should be the value of the eligible holder's [§ 1.17] proportionate interest in the corporation, without any discount for minority status or, absent extraordinary circumstances, lack of marketability....

"Extraordinary circumstances" are further explained in comment (e) to § 7.22(a), at 312, which reads in pertinent part:

Under a very limited exception to the principles set forth in § 7.22(a), the court may determine that a discount reflecting the lack of marketability of shares is appropriate in "extraordinary circumstances." Such circumstances require more than the absence of a trading market in the shares; rather, the court should apply this exception only when it finds that the dissenting shareholder has held out in order to exploit the transaction giving rise to appraisal so as to divert value to itself that could not be made available proportionately to other shareholders.... [I]t would be inappropriate to apply a marketability discount ... if the shareholder was dissenting to a fundamental corporate change such as a merger, rather than a relatively minor matter.

■ We recognize that a trial court's findings are entitled to great deference and will not be disturbed on appeal unless those findings are not fairly supported by adequate, substantial, and credible evidence. *Rova Farms Resort, Inc., supra,* 65 *N.J.* at 484, 323 *A.*2d 495. However, we do not believe the record in this case supports a finding of "extraordinary circumstances."

The dissenters in this case wanted liquidity for their stock and wanted to sell their stock in a corporation now controlled by new management in whom they lacked confidence. That is not an "extraordinary circumstance." In fact, most appraisal cases involving family-held corporations concern family feuds. *See generally* J. Anthony & K. Boraas, *Betrayed, Belittled ... But Triumphant: Claims of Shareholders in Closely Held Corporations,* 22 *Wm. Mitchell L.Rev.* 1173 (1996). To find such circumstances extraordinary would be inconsistent with the purpose of the

Appraisal Statute. We believe that what the trial court viewed as an "extraordinary circumstance" is a most ordinary circumstance in cases of this sort.

We also do not agree that the dissenters "sought to exploit the transaction, so as to divert value to [themselves] that could not be made available proportionately to other shareholders." *See* 2 *ALI Principles,* comment (e) to ¶ 7.22. All of the corporate actions in this case, *i.e.* the "shareholder liquidity plan"; the voting trust that restricted sales of Wheaton stock outside the family; and the restructuring plan that triggered the dissenters' rights under the Appraisal Statute, were adopted by the majority shareholders who ran Wheaton, without any participation by the dissenters. Wheaton was aware that shareholders had the right to dissent and seek the fair value of their shares if the Company adopted the restructuring plan. In adopting that plan, we assume the Company accepted those rights as part of the ordinary consequences of the restructuring plan.

The adoption of the restructuring plan allowed the dissenters to become legally entitled to receive the fair value of their stock and to bring an action under the Appraisal Statute if necessary. The dissenters should not be penalized for exercising their rights to dissent or for implementing the protection afforded by the Appraisal Statute. In short, the company instigated the restrictions and restructuring; the dissenters merely pursued their lawful options. Such actions simply do not constitute "extraordinary circumstances." Accordingly, we refuse to diminish the fair value of their shares.

## V.

*N.J.S.A.* 14A:11–3(3)(a) provides that "fair value" shall be determined "as of the day prior to the day of the meeting of shareholders at which the proposed action was approved. . . ." It further provides that "[i]n all cases, the 'fair value' shall exclude any appreciation or depreciation resulting from the proposed action." *N.J.S.A.* 14A:11–3.

In *Strasenburgh, supra,* 146 *N.J.* at 545, 683 *A.*2d 818, when we remanded the case to the Chancery Division to determine the "fair value" of the dissenters' shares, we directed "that the trial court be permitted in its discretion to reopen the record in the appraisal proceedings for consideration of events that have transpired since the hearing closed." [9] Significantly, we also stated that the court could

> consider the company's recent merger *in making a just and equitable determination of the appraisal value as of 1991. Before us, the company argued that its financial condition had deteriorated between 1991 and 1996.* We realize that the trial court in the appraisal action has determined to limit proofs to the events at the time of the December 1991 valuation. We surmise that these matters of artificial deflation of stock values were fully canvassed in that proceeding and if the court is satisfied to enter judgment on the record before it, it may do so. [*Id.* at 545–46, 683 *A.*2d 818 (emphasis added).]

A trial court's findings will not be disturbed if they are supported by adequate, substantial and credible evidence. *Rova Farms Resort Inc., supra,* 65 *N.J.* at 483–84, 323 *A.*2d 495. We do not believe, however, that standard has been met in this case. The Company's own financial statements disclose that the fair value of the Company was greater in 1991 than in 1996. In 1991, total shareholders' equity was $193,690,000 ($162,072,000 after deducting the subsequently booked $31,618,000 liability to dissenting shareholders), and pre-tax income would have been $19,359,-000 after adjustments for unusual items. In December 1991, management stated: "We feel confident that we are poised to have a strong year in 1992."

By 1996, management had "substantial doubt about the Company's ability to continue as a going concern." *See* page 32 of Wheaton Proxy statement, section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations." According to the May 1, 1996 proxy statement prepared by the Company in conjunction with the Alusuisse merger, share-

---

[9] In hindsight, we should have required the record to be reopened for the limited purpose of considering how the Alusuisse merger price bears on the value of the corporation at the time of the restructuring.

holders' equity had declined to $111,633,000 by March 31, 1996 (after deducting the $31,618,000 liability to dissenting shareholders); and in 1995, the Company had a net loss of $48,000,048.

The Chancery Division refused to reopen the record to consider the $63.00 per share Alusuisse acquisition price. The court determined that the Alusuisse acquisition price was neither known nor knowable as of December 5, 1991. The court reasoned that if it opened the record for that transaction, it would have to open the record for all events occurring subsequent to the December fifth date, whether known or knowable, and then attempt somehow to relate it back. We disagree.

In 1996, the company stock was valued at $63.00 per share, as evidenced by the merger price. This value occurred at the end of the Company's admittedly steady financial deterioration. The trial court should have considered that factor to gauge, assess, and determine the fair value of the dissenters' stock on December 5, 1991, the valuation date.

### As the United States Court of Claims has recognized:

It is a highly rational and persuasive inference that if something is worth $50.00 when the market for it is bad, then it must have been worth more when the market was better, all other things being equal. The court is convinced from the government's own evidence that this was the case here. The only relevant change in the financial condition of Mechtron between the gift date and the 1979–1980 stock transaction was a general decline.

[*Krapf v. United States*, 17 Cl.Ct. 750, 762–63 (1989), *rev'd on other grounds*, 977 F.2d 1454 (Fed.Cir.1992) ].

Although reversing the Court of Claims, the Federal Circuit recognized the logic of the Claims Court's rationale:

The government makes a number of attacks on the Claims Court's valuation. It initially argues that the "rule" stated by the Claims Court from distillation of the case law excludes consideration of post-donation sales of stock in connection with the fair market valuations if the corporation has had any significant change in circumstances, even downward. *Such a rule would be grossly unfair. If the taxpayer can prove that the evaluation at the time of the gift is at least that of a later transaction, we can see no logical reason to bar acceptance of such transaction as the "floor" for the evaluation, even when there has been a material change in the corporate business.*

[*Krapf, supra*, 977 F.2d at 1458 (emphasis added).]

Delaware courts also have recognized the utility of post-merger information in the appraisal context. Although Delaware courts generally are not receptive to arguments based on post-merger information, the courts nonetheless permit dissenting shareholders to obtain discovery with respect to post-merger events because such information can cast light on the value of the corporation at the time of the merger. Wertheimer, *supra*, 47 *Duke L.J.* at 694, n.432.

Given Wheaton's financial history, the record should be re-opened for the limited purpose of enabling the trial court to consider the $63.00 per share Alusuisse acquisition price in its determination of the fair value of the dissenters' stock on December 5, 1991. Even though the Company's fortunes waned during the 1991 to 1996 period, the stock, in an arms-length transaction, was worth $63.00 per share in 1996. We question the Company's assertion that the fair value of the dissenters' stock on December 5, 1991, was only $41.50 per share.

## VI.

In both *Balsamides, supra*, 160 *N.J.* at 381, 734 *A.*2d 721, and in this case, we have held that the "equities of the cases" must be considered when ascertaining "fair value" in appraisal and op-pressed shareholder actions. In *Balsamides*, we required the oppressing shareholder to sell his stock to the oppressed share-holder. We held that the trial court properly applied a marketa-bility discount in determining the fair value of the shares of the oppressing shareholder. *Id.* at 379, 734 *A.*2d 721. We observed that in cases "where the oppressing shareholder instigates the problems, . . ., fairness dictates that the oppressing shareholder should not benefit at the expense of the oppressed. . . . The statute does not allow the oppressor to harm his partner and the company and be rewarded with the right to buy out that partner at a discount. We do not want to give a shareholder any incentive to oppress other shareholders." *Id.* at 382–83, 734 *A.*2d 721. In both cases, we apply the same guiding principle—a marketability

discount cannot be used unfairly by controlling or oppressing shareholders to benefit themselves to the detriment of the minority or oppressed shareholders. *Ibid.*

We, therefore, reverse the judgment of the Appellate Division and remand to the trial court for a recalculation of the "fair value" of the dissenters' shares, to be determined without application of the marketability discount, and after reopening the record for the limited purpose of considering the significance of the $63.00 per share Alusuisse merger price. Because we hold that the marketability discount should not be applied in determining the "fair value" of the dissenters' stock, such a revaluation cannot result in a lower "fair value" per share than $56.70, the value Wheaton's expert found before applying the marketability discount.

*For reversal and remandment*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.