SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

## Robert Sipko v. Koger, Inc. (A-74-20) (085022)

**Argued January 3, 2022 -- Decided June 23, 2022**

**PIERRE-LOUIS, J., writing for a unanimous Court.**

In this case, the Court considers whether a marketability discount should be applied to the valuation of Robert Sipko's interests in Koger Distributed Solutions, Inc. (KDS) and Koger Professional Services, Inc. (KPS).

This matter, now before the Court for the second time, concerns a family embroiled in a litigation that commenced 15 years ago. The Court provided an extensive and detailed history of the underlying facts in this case in Sipko v. Koger, Inc., 214 N.J. 364 (2013). In summary, George Sipko formed Koger, Inc., and later gifted 1.5 percent of the company's stock to his twin sons, Robert Sipko and Rastislav Sipko (Ras) -- both of whom were actively involved with the company. George formed KDS and KPS in 2002 and 2004, respectively, with both Robert and Ras each owning 50 percent of each company's shares.

A family disagreement arose over a woman whom Robert began dating and eventually married. As a result of the family divide, Robert resigned from Koger on March 10, 2006. Prior to his resignation, Robert signed two documents memorializing the transfer of his 50 percent interest in both KDS and KPS. The document involving the transfer of KDS stock bears the date "02/03/2006." The document that memorialized the transfer of KPS stock, however, was dated "12/31/04." Robert filed suit against George, Ras, and Koger on November 13, 2007, alleging that he was an oppressed shareholder and presenting an expert valuation of the companies. After a bench trial, the court ruled in January 2009 that KDS and KPS had no independent value as distinct companies from Koger and that Robert recognized "that his interests in KDS and KPS had no value, [and] voluntarily surrendered those interests." Id. at 373.

The Appellate Division reversed, reasoning that the transfers lacked consideration and were therefore void. In 2013, the Court affirmed and remanded "for consideration of what, if any, remedy is appropriate," noting that "the trial court has broad discretion to consider such statutory and equitable remedies as may be appropriate to this setting." Id. at 383-84.

1

Less than two weeks after the issuance of the Court's 2013 opinion, the trial judge, who had presided over this matter since its commencement in 2007, conducted a hearing regarding the appropriate remedy to be fashioned to compensate Robert for his interests in KDS and KPS.  Robert advocated for a buyout of his interests in the two companies as of the filing date of the complaint in November 2007.  In the alternative, Robert asked for an accounting of all three companies -- Koger, KDS, and KPS -- and the appointment of a fiscal agent to protect the remaining assets.  Defendants argued that the only possible remedy was dissolution of the companies, which at that point had absolutely no value.

The trial court found that an accounting of KDS and KPS was appropriate, after which it would reconsider possible remedies.  The accounting revealed plenty about what transpired with KDS and KPS prior to and after Robert filed the complaint in 2007.  For example, several lucrative contracts were transferred to Koger after the litigation commenced, and the trial court found that this was done to shield the value of the independent entities from Robert.  The trial court also found that Ras backdated Robert's stock transfer certificate for KPS from February 2006 to December 2004 in an effort to deprive Robert of his interests in certain contracts he negotiated in 2005 that "began to yield rich fruit in 2006."  The judge concluded that the "only appropriate available remedy" was to impose a buyout obligation upon George and Ras and order them to pay Robert the value of his 50 percent interests in KDS and KPS as of the date Robert filed the complaint on November 13, 2007.

The trial court offered George and Ras the opportunity to call their own expert to value the companies given that they had directed their trial expert not to independently value the companies.  Defendants, however, declined to call an expert.  Based on "the coherent and convincing and unrebutted evidence of value" in the companies put forth by Robert's expert at trial, the trial court valued the companies.  It filed a judgment awarding Robert damages in the amount of $24,697,571.14, jointly and severally, which included pre-judgment interest in the amount of $6,437,311.14.

After the trial court entered its judgment in favor of Robert, defendants' pattern of acts calculated to prevent Robert from obtaining compensation for his interests in KDS and KPS continued.  Post-judgment, for example, Ras offered to post $3 million in cash and real property in Connecticut that he valued at $6.75 million, but he then named that property as a marital asset in his divorce proceedings, resulting in further litigation.  Most shockingly, the sworn accounting revealed that George and Ras, while representing to the court for months that they did not have money with which to post a bond, had transferred approximately $20 million in cash to overseas accounts in a series of transactions between July 28, 2016 (one day after the judge issued his decision awarding $18 million to Robert) and August 11, 2016 (approximately one week before entry of the judgment).

2

Meanwhile, George and Ras appealed. The Appellate Division affirmed the buyout remedy but agreed with defendants that the trial court improperly accepted Robert's expert's opinion, which it had implicitly rejected at trial in 2008, without any explanation for the acceptance on remand; in the appellate court's view, the trial court simply failed to reach "a reasoned, just and factually supported conclusion." The Appellate Division also took issue with the trial court's failure to determine the application of a marketability discount to the value of KDS and KPS.

The Court granted certification, limited to Robert's challenge of the remand for the reconsideration of the valuation of KDS and KPS. 247 N.J. 413 (2021).

**HELD:** In light of all the defendants' conduct regarding KDS and KPS to strip Robert of his rightful interests, equity cannot abide imposing a marketability discount to the benefit of defendants. The trial court's acceptance of Robert's expert's valuation of the company fell within its broad discretion and was fully supported by the record. Defendants were given the opportunity to present an expert valuation of the companies on remand but made the strategic decision not to do so. The Court declines to provide defendants with another bite of this thoroughly chewed apple and reinstates the judgment of the trial court.

1. The Court leaves intact its finding in 2013 that Robert did not demonstrate himself to be an oppressed shareholder but notes that, even if the minority shareholder is not deemed to be oppressed, "[i]llegality and fraud may also frustrate a shareholder's reasonable expectations for a company." The Oppressed Shareholder Statute affords a range of individualized remedies in the presence of appropriate proofs, including ordering the buyout of shares at "their fair value as of the date of the commencement of the action" or another "date deemed equitable by the court." N.J.S.A. 14A:12-7(8). Whether the corporation's fair value should be reduced by a marketability discount is part and parcel of the fair value determination. Marketability discounts reflect the decreased worth of shares of stock in a closely held corporation, for which there is no readily available market. The very nature of the term "fair value" suggests that courts must take fairness and equity into account in deciding whether to apply a discount to the value of the dissenting shareholders' stock. In fact, N.J.S.A. 14A:12-7(8) expressly authorizes a court to judicially order a sale of the corporation's stock held by any shareholder who is party to the litigation if the court determines that "would be fair and equitable to all parties under all of the circumstances of the case." (pp. 23-27)

2. Depending on the facts, fairness and equity can compel the decision to apply a marketability discount, or not. The Court reviews its decisions In Balsamides v. Protameen Chemicals, Inc., 160 N.J. 352 (1999), where equity compelled the application of a marketability discount, and Lawson Mardon Wheaton, Inc. v. Smith, 160 N.J. 383 (1999), where equitable principles prevented the application of a

3

discount.  <u>Balsamides</u> and <u>Lawson</u> underscore the importance of determining the "fair value" of a corporation on a case-by-case basis.  The guiding principle in such cases is that a marketability discount cannot be used unfairly by the parties whose misconduct and bad faith caused the corporate split to benefit themselves to the detriment of the injured parties.  (pp. 27-30)

3.  With fairness and equity in mind, the Court finds it cannot ignore the many instances in which defendants took deliberate steps to prevent Robert from recovering any value through actions that laid bare their understanding of just how valuable the companies were.  Even without defendants' post-judgment misfeasance, blatant misrepresentations to the trial court, lack of transparency regarding their financials and financial transactions, and, in George's case, fleeing the country to escape enforcement of the court's order, defendants engaged in enough <u>pre-judgment</u> misconduct between the filing of the complaint and the Court's 2013 opinion to justify not applying the discount when considering the equities, such as backdating the stock transfer certification and diverting valuable contracts from KPS to Koger.  Defendants now ask the Court, after acting unfairly at almost every turn, to apply a doctrine rooted in fairness to relieve them of their responsibility to buyout Robert for the amount determined by the trial court.  The Court declines to do so. (pp. 30-34)

4.  Further, the trial court's acceptance of Robert's expert's valuation was fully supported by the record.  The court's finding in 2009 that the companies had no value does not undermine its acceptance of Robert's expert's valuation on remand.  The reality of the appellate process is that courts must often proceed on remand in a manner that is the complete opposite of the court's previous position.  There are several reasons why the trial court logically did not consider on remand the 2008 testimony from George and Ras's expert that KDS and KPS had no value.  And the court gave defendants an opportunity on remand to call an expert to present their position on the valuation of the companies.  They declined, making the strategic decision to refuse to abandon their argument that the companies had no value. Defendants took a risk and it did not pay off.  They now want another bite at the apple.  Given all that has transpired in this case and all of defendants' misconduct, however, the Court declines to allow that.  (pp. 34-40)

**REVERSED.  REMANDED to the trial court for REINSTATEMENT of judgment.**

**CHIEF JUSTICE RABNER; JUSTICES ALBIN and SOLOMON; and JUDGE FUENTES (temporarily assigned) join in JUSTICE PIERRE-LOUIS's opinion. JUSTICE PATTERSON did not participate.**

4

SUPREME COURT OF NEW JERSEY
A-74 September Term 2020
085022

_____

Robert Sipko,

Plaintiff-Appellant,

v.

Koger, Inc., Koger Distributed Solutions, Inc.,
Koger Professional Services, Inc.,
Koger Limited (Dublin), and
Rastislav Sipko,

Defendants-Respondents,

and

George Sipko,

Defendant.

_____

Robert Sipko,

Plaintiff,

v.

Rastislav Sipko,

Defendant,

and

Koger, Inc., Koger Distributed
Solutions, Inc., Koger Professional

1

Services, Inc., Koger Limited (Dublin),
and George Sipko,

Defendants.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|--------|---------|
| January 3, 2022 | June 23, 2022 |

Michael S. Stein argued the cause for appellant (Pashman Stein Walder Hayden, attorneys; Michael S. Stein, of counsel and on the briefs, and Erik M. Corlett and Timothy P. Malone, on the briefs).

Scott E. Reiser argued the cause for respondents Koger, Inc., Koger Distributed Solutions, Inc., Koger Professional Services, Inc., and Koger Limited (Dublin) (Lum, Drasco & Positan, attorneys; Scott E. Reiser and Paul A. Sandars, III, of counsel and on the briefs).

Joseph P. LaSala argued the cause for respondent Rastislav Sipko (McElroy, Deutsch, Mulvaney & Carpenter, attorneys; Joseph P. LaSala, of counsel and on the brief).

JUSTICE PIERRE-LOUIS delivered the opinion of the Court.

This matter, now before this Court for the second time, concerns a family embroiled in a litigation that commenced 15 years ago. In this case, we must determine whether the trial court's finding as to the valuation of Robert Sipko's interests in Koger Distributed Solutions, Inc. (KDS) and Koger

2

Professional Services, Inc. (KPS) should be upheld, or if there should be a determination of whether a marketability discount should be applied to that value, as the Appellate Division held in remanding the case.

The issues underlying this matter and the relevant parties are not foreign to this Court. In 2013, we affirmed the Appellate Division's holding that KDS and KPS had value as independent entities rather than being solely dependent on their parent company, Koger Inc. (Koger). We also held that Robert's[1] relinquishment of his 50 percent interests in KDS and KPS in 2006 was void for lack of consideration. Accordingly, we remanded the matter to the trial court to determine what, if any, remedy was appropriate to compensate Robert for his interests in KDS and KPS -- companies that were rendered valueless by the time the matter reached this Court.

This appeal centers around what has transpired since we remanded this case. In 2016, the trial court held that the appropriate remedy was a buyout of Robert's interests in the companies given the court's finding that George and Rastislav Sipko deliberately stripped the companies of value for the specific purpose of putting the money beyond Robert's reach. The trial court accepted Robert's expert's valuation of the companies and found that KDS and KPS, at

---

[1] Given that the family members have the same last name, we use their first names to avoid confusion. We intend no disrespect by this informality.

the time Robert filed the complaint in 2007, were worth approximately $1.5 million and $34.9 million, respectively. Accordingly, Robert's 50 percent ownership in both companies totaled over $18 million, plus interest.

On appeal, the Appellate Division agreed that a buyout was the appropriate remedy given the record. The court, however, remanded the matter for the trial court to determine whether a marketability discount should be applied.

For the reasons set forth below, we reverse the judgment of the Appellate Division and reinstate the trial court's judgment in Robert's favor.

I.

This Court provided an extensive and detailed history of the underlying facts in this case of a fractured family and broken family businesses in our 2013 opinion. Sipko v. Koger, Inc., 214 N.J. 364 (2013).

In summary, George Sipko, an experienced processor programmer from Slovakia, formed Koger in 1994. Thereafter, George gifted 1.5 percent of the company's stock to his twin sons, Robert Sipko and Rastislav Sipko (Ras) -- both of whom were actively involved with the company. George formed KDS and KPS in 2002 and 2004, respectively, with both Robert and Ras each owning 50 percent of each company's shares.

The underlying dispute in this case arose from a family disagreement over a woman whom Robert began dating and eventually married. The dispute divided both the family and the family businesses. As a result of the family divide, Robert resigned from Koger on March 10, 2006. Prior to his resignation, Robert signed two documents memorializing the transfer of his 50 percent interest in both KDS and KPS. The document involving the transfer of KDS stock bears the date "02/03/2006." The document that memorialized the transfer of KPS stock, however, was dated "12/31/04." At a Koger board meeting later that year, George recalled the 1.5 percent of Koger stock that he had given to Robert in 2000.

Robert filed suit against George, Ras, and Koger on November 13, 2007, alleging that he was an oppressed shareholder. Robert claimed that he signed the documents transferring his stock in KDS and KPS under duress, but George and Ras argued that Robert voluntarily relinquished his shares.

After a bench trial, the court ruled in January 2009 that George's gift of 1.5 percent of Koger stock to Robert was unconditional and thereby effective. However, the trial court held that KDS and KPS had no independent value as distinct companies from Koger and that Robert recognized "that his interests in KDS and KPS had no value, [and] voluntarily surrendered those interests." See 214 N.J. at 373.

5

In May 2011, the Appellate Division reversed the trial court and found that George's gift of the 1.5 percent of stock to Robert was conditioned on Robert's continued employment with the company. The court also reversed the trial court's decision regarding Robert's surrender of his stock interests in KDS and KPS, reasoning that the transfers lacked consideration and were therefore void.

We reversed in part and affirmed in part. Id. at 378, 381. We reversed the Appellate Division's finding that George's gift to Robert of Koger stock was conditional and reinstated the trial court's holding that the gift was unconditional, so Robert was entitled to his 1.5 percent interest in Koger. Id. at 378.

Relevant to the present appeal, we affirmed the Appellate Division's reversal of the trial court's finding that KDS and KPS lacked any independent value and that Robert voluntarily surrendered his interests in those companies. Id. at 379. Based on the expert testimony presented by Hubert Klein, Robert's expert at trial in 2008, KDS was valued at $1,547,278 and KPS at $34,973,236. Ibid. At trial, Ras and George "instructed their valuation expert not to separately calculate the value of the two companies." Ibid. We found that "Robert's interests in KDS and KPS clearly had value" and that "the trial

6

court's conclusion that [both companies] were devoid of value [could not] be sustained." Id. at 379-80.

We further found that Robert did not relinquish his interests in KDS or KPS, concurring with the Appellate Division's conclusion that Robert's transfer of KDS and KPS stock via the two signed documents was void for lack of consideration. Id. at 381. We observed that determining the appropriate remedy for Robert was "complicated by the procedural posture of this case" because the trial court had treated the three companies of Koger, KDS, and KPS as a single entity. Ibid. We therefore remanded the matter and "require[d] the trial court to reinstate all of Robert's enumerated claims as they relate[d] to KDS and KPS, and to consider those claims on their merits." Id. at 382. Although we expressly left intact the trial court's determination that Robert failed to demonstrate shareholder oppression, we held that "a minority shareholder's failure to demonstrate conduct that rises to the level of oppression does not necessarily deprive him of a remedy" because N.J.S.A. 14A:12-7(1)(c) "does not limit the equitable power of the courts to fashion remedies appropriate to an individual case." Id. at 382-83.

Accordingly, we remanded "for consideration of what, if any, remedy is appropriate," noting that "the trial court has broad discretion to consider such statutory and equitable remedies as may be appropriate to this setting,

7

including but not limited to an accounting of the income and expenditures of KDS and KPS." Id. at 383-84.

## II.

## A.

Our remand for a determination of a potential remedy for Robert's interests in KDS and KPS forms the backdrop of this current appeal.

Less than two weeks after the issuance of this Court's 2013 opinion, the trial judge, who had presided over this matter since its commencement in 2007, conducted a hearing regarding the appropriate remedy to be fashioned to compensate Robert for his interests in KDS and KPS. Robert advocated for a buyout of his interests in the two companies as of the filing date of the complaint in November 2007. In the alternative, Robert asked for an accounting of all three companies -- Koger, KDS, and KPS -- and the appointment of a fiscal agent to protect the remaining assets. Defendants argued that the only possible remedy was dissolution of the companies, which at that point had absolutely no value.

The trial court issued a written decision in July 2014 finding that an accounting of KDS and KPS was appropriate, after which it would reconsider possible remedies. The accounting was to include "all revenues and distributions, assets and liabilities of both KDS and KPS, [from] January[]

8

2006 to the present, and including an accounting of the use and disposition of all assets, including contracts, for that time period." The trial court noted that "the accounting may reveal a justification for further remedies in this case . . . for money damages, constructive trusts and/or buy-outs, depending upon what is revealed."

Suffice it to say, the accounting revealed plenty about what transpired with KDS and KPS prior to and after Robert filed the complaint in 2007. The accounting showed that by the end of 2005, KDS and KPS had entered into numerous substantial contracts with automatic renewal provisions after five years. The accounting further noted, however, that four out of seven KPS contracts were, for some reason, transferred to Koger either during trial or after the Appellate Division's 2011 opinion finding Robert's surrender of his 50 percent interest in both companies void for lack of consideration. As for KDS, one particularly valuable contract was transferred to Koger in September 2007.[2]

Ras claimed that the contracts were "outsourced" to Koger because he could no longer operate the companies without Robert, but the trial court

_____

[2] Although the complaint was filed in November 2007, defendants were aware of the pending litigation months prior. In fact, in August 2007 letters to Robert's counsel, defense counsel for Koger disclaimed Robert's interests in most of the family companies and properties.

9

found that "the obvious, purposeful effect of draining these independent entities of value [was] for the specific purpose of shielding value from Robert." The trial court further noted that "the valuable contracts transferred or surrendered or assigned by KDS and KPS (i.e. by Ras) to Koger, Inc. was part and parcel of a strategy to render Robert's interests in KDS and KPS zero." The trial court concluded that the companies were, at that point in 2016, "valueless because they ha[d] been stripped of their value by Ras and George."

The trial court also found that Ras backdated Robert's stock transfer certificate for KPS, the more valuable of the two companies, from February 2006 to December 2004. Based on the record before the trial court, the court found that it was evident that the certificate was backdated in an effort to deprive Robert of his interests in certain contracts he negotiated in 2005 that "began to yield rich fruit in 2006."

Because KDS and KPS were worthless by the time of the completed accounting in July 2016, the court determined that a third-party sale or forced dissolution of the companies would be empty or insignificant remedies. Therefore, the judge concluded that the "only appropriate available remedy" was to impose a buyout obligation upon George and Ras and order them to pay Robert the value of his 50 percent interests in KDS and KPS as of the date

10

Robert filed the complaint on November 13, 2007. The trial court offered George and Ras the opportunity to call their own expert to value the companies given that George and Ras had directed their trial expert <u>not</u> to independently value the companies. Defendants, however, declined the trial court's invitation and did not call an expert.[3]

Based on "the coherent and convincing and unrebutted evidence of value" in the companies put forth by Robert's expert Klein at trial, the trial court found that, at the time the complaint was filed, KDS had a fair value of $1,547,278 and KPS had a value of $34,973,236. In summary, the trial court found that the mischief George and Ras engaged in regarding KDS and KPS after the litigation commenced in this matter called for only one possible resolution:

> The undisclosed assignment of assets, the redirecting of contract revenues, the backdating of the stock certificate, the misrepresentation and nondisclosure of assets in the KDS account at the time of the original trial, properly require a remedy. And the only appropriate available remedy is to compel a buyout.

Pursuant to Klein's valuation, the judge determined that Robert's 50 percent interest in KDS was worth $773,642 and his 50 percent interest in KPS

---

[3] At oral argument, counsel for defendants admitted that not calling an expert regarding the valuation determination on remand was a strategic decision. To this day, defendants have never, during the entire 15-year pendency of this litigation, put forth a valuation of KDS and KPS.

was worth $17,486,618, for a total amount of $18,260,257, excluding pre-judgment interest. The court's opinion, which detailed the findings against defendants, was filed on July 27, 2016.

On August 19, 2016, the court filed a judgment awarding Robert damages against George, Ras, and the corporate entities of Koger, KPS, and KDS in the amount of $24,697,571.14, jointly and severally, which included pre-judgment interest in the amount of $6,437,311.14. The court imposed a constructive trust on Koger's profits and enjoined George, Ras, and Koger from transferring any assets until full satisfaction of the judgment or the posting of an appropriate bond. Further, the judge denied George's and Ras's motion for reconsideration and to post alternative security for a stay pending appeal by an order dated September 26, 2016.

## B.

After the trial court entered its judgment in favor of Robert, defendants' pattern of acts calculated to prevent Robert from obtaining compensation for his interests in KDS and KPS continued. Post-judgment, George and Ras claimed, without documentary support, that they were unable to post a bond. They filed an application to post alternative security, supported by their certifications offering their combined 98.5 percent interest in Koger. Further,

12

Ras offered to post $3 million in cash and real property in Connecticut that he valued at $6.75 million.[4]

On September 30, 2016, the trial court entered an order granting the posting of the alternative security, conditioned upon George and Ras providing a sworn accounting of both foreign and domestic assets and liabilities. The order provided that if the court found any material misrepresentation in the sworn accounting, it would forfeit defendants' posted cash, deed, and stock in partial satisfaction of the judgment and vacate the stay of execution of the judgment. The court also ordered George and Ras to provide "audited

---

[4] Although Ras offered the Connecticut property as alternative security, stating that he was "ready and willing to pledge [the] real property," shortly thereafter, without notice to the court, Ras obtained an attachment order in his Connecticut divorce proceeding which made that property part of the assets to be distributed in the divorce and, therefore, beyond the trial court's reach. After several years of proceedings, a Connecticut court has ordered the sale of the property, with 65 percent of the sale price to be disbursed to satisfy any unpaid balance of the judgment in favor of Robert.

financial statements within 100 days," and enjoined them from encumbering, secreting, or transferring any assets outside the ordinary course of business.[5]

On November 7, 2016, the court granted Robert's request to appoint a special fiscal agent (SFA) to oversee Koger. The judge also ordered and required George and Ras to file, within thirty days, a sworn accounting of transactions by Koger that exceeded $50,000, and of any transactions by George or Ras that exceeded $10,000, from September 30, 2015 to November 30, 2016.

The accounting of transactions filed with the SFA on January 13, 2017 was telling. It revealed that Ras "drew down $2.5 million on his credit line, exhausting the line, days after the post-remand decision." Defendants also revealed, apparently for the first time in December 2016, that they owned real estate in Slovakia that their appraiser valued at approximately $23 million. Robert asserted that he was completely unaware of the three newly disclosed

---

[5] On October 28, 2016, George and Ras submitted unaudited financial statements. The trial court found that the accounting firm neither asked nor verified the accuracy or completeness of the information provided by defendants; both defendants "elected to omit substantially all the disclosures ordinarily included in the statement of financial condition prepared in accordance [with] generally accepted accounting principles." The financial disclosures did not contain corroborating documentation to support their veracity. The disclosures did note that George had a total net worth of $44,051,100 and Ras had a net worth of $21,729,700.

14

properties and that his appraisers in Slovakia valued the land as worth a total of approximately $3.1 to $4.3 million.

Most shockingly, the sworn accounting revealed that George and Ras, while representing to the court for months that they did not have money with which to post a bond, had transferred approximately $20 million in cash to overseas accounts in a series of transactions between July 28, 2016 (one day after the judge issued his decision awarding $18 million to Robert) and August 11, 2016 (approximately one week before entry of the judgment).

At a hearing, George and Ras claimed that they sent the money overseas to pay off a debt to a relative who supposedly had lent them $17 million to purchase several properties in Slovakia -- the same properties that defendants first disclosed to the court and Robert in December 2016.[6] According to defendants, the loan became due in August 2016 and it was entirely coincidental that they needed to begin paying off the debt and transferring millions of dollars to Slovakia the day after the trial court's ruling in favor of

_____

[6] These were not the only properties defendants failed to mention. Despite the trial court's directives for candor regarding defendants' assets and liabilities, George never once mentioned in his disclosures to the court that he also held interests in 22 parcels of land in Slovakia, purportedly consisting of four acres according to defendants. George claimed these were ancestral farmlands of little value gifted to him upon his father's death. The trial court found that the failure to disclose the properties did not impact the discussion of defendants' ability to post a bond due to the apparent low value.

Robert. The trial court found that the transfers totaling approximately $20 million in supposed repayment of the loan were not made to the alleged holder of the note, but rather were sent to George's sister and nephew, and to the wife or daughter of George's brother-in-law. Although they claimed they owed a significant amount of money on the loan, defendants provided no evidence to the court of any loan documents or evidence of the money they spent to acquire the properties and no evidence whatsoever of the claimed significant financial transactions related to the $20 million.

The court concluded that defendants' claim of a loan payoff was a fabrication, "simply a made up story to camouflage a desperate effort to secrete assets overseas to family members to shield those monies from Robert and his lawyers."[7] The court further found that "the reason $20M [in] U.S.

---

[7] The trial court noted the odd scenario in which defendants would disclose, for the first time post-judgment, interests in overseas properties with "wildly inflated values" of approximately $23 million, almost the exact amount of the judgment against them. The trial court noted that "one would expect it would be in Defendants' best interests to advance a low ball number for the assets." The trial court concluded that the

> reason Defendants would attribute a $23 million value to the three (3) until recently undisclosed foreign properties, is to explain why $20 million was wired overseas to purportedly save them from foreclosure. An equivalence of value to pay-off would support Defendants' claim that the undisclosed payoffs of the undisclosed liens on the undisclosed properties was bona fide, not contrived.

16

dollars fled this country for Slovakia, secretly distributed to these overseas relatives, was because George and Ras panicked in the face of the $18M award in favor of Robert against them, and were desperate to get the money out of the country and beyond his reach."

In an order dated July 3, 2018, the trial court held that George and Ras were in violation of litigant's rights and directed defendants to return $18 million by July 16, 2018. If the defendants failed to return the money by that date, they were to appear in court on July 19 to be remanded to the Bergen County jail to serve each weekend until the money was returned. As of July 19, 2018, the money was not returned. Ras appeared to commence his commitment, but George absconded the country. The trial court issued a warrant for George's arrest, but he continues, as of the filing of this opinion, to be a fugitive from the court.

C.

Defendants appealed the trial court's orders on several grounds. Relevant to this appeal, defendants challenged the buyout remedy and the valuation of KDS and KPS. The Appellate Division was also tasked with

17

reviewing three consolidated appeals, but the valuation of the companies is the only issue germane to the present matter.[8]

In an unpublished opinion, the Appellate Division affirmed the buyout remedy but agreed with defendants regarding the valuation of the companies. The Appellate Division held that the trial court improperly accepted Robert's expert's opinion, which it had implicitly rejected at trial in 2008, without any explanation for the acceptance on remand; in the appellate court's view, the trial court simply failed to reach "a reasoned, just and factually supported conclusion." The Appellate Division noted that such a deficient analysis was problematic in light of the trial testimony of George's and Ras's expert, Martin Schmidt, in 2008. At trial, although defendants instructed Schmidt not to independently value KDS and KPS, Schmidt asserted that Robert's expert, Klein, failed to account for the impact that Koger -- its support, infrastructure, and goodwill -- had on the value of KDS and KPS. In his criticism of Klein, Schmidt further noted that Klein lacked knowledge regarding the licensing agreements between Koger, KDS, and KPS.

---

[8] Based on the fugitive disentitlement doctrine, Robert moved to dismiss George's appeal, citing the trial court's conclusion that George fled the jurisdiction after secretly diverting assets overseas to frustrate Robert's ability to collect on the judgment and the court's threat of imprisonment unless the assets were returned. See Matsumoto v. Matsumoto, 171 N.J. 110, 119 (2002). The Appellate Division granted Robert's motion, so George is not a party to this appeal.

The Appellate Division also took issue with the trial court's failure to determine the application of a marketability discount to the value of KDS and KPS, noting that Schmidt "justified application of a marketability discount" to the value of the companies. The court observed that pursuant to Balsamides v. Protameen Chemicals, Inc., 160 N.J. 352, 377 (1999), trial courts must decide whether to apply such a discount and "must take into account what is fair and equitable[]" in determining the value of shares in a closely held corporation.

For those reasons, the Appellate Division "reluctantly remand[ed] the matter to the trial court for the reconsideration of the valuation of KDS and KPS, and, in turn, the value of Robert's 50 percent interest in each corporation as of the valuation date." On remand, the Appellate Division instructed the trial court to "consider all sources of information that affect the fairness and equity of Klein's suggested buyout price, including Schmidt's criticisms."

D.

We granted Robert's petition for certification, limited to the propriety of the remand for the reconsideration of the valuation of KDS and KPS. 247 N.J. 413 (2021). We denied Ras's and Koger's petitions for certification challenging, in part, the buyout remedy and the trial court's factual findings. 247 N.J. 407 (2021); 247 N.J. 409 (2021).

19

III.

A.

Robert argues that the Appellate Division erred in remanding the matter to the trial court for reconsideration of the valuation of KDS and KPS. Robert contends that another remand will effectively give defendants "a new bite at the apple" because they strategically declined the trial court's invitation to present an alternative valuation of KDS and KPS. Robert emphasizes that a marketability discount, pursuant to Balsamides and Lawson Mardon Wheaton, Inc. v. Smith, 160 N.J. 383, 398 (1999), should not be applied to benefit defendants who have acted inequitably throughout the entire course of litigation. Robert further submits that the Appellate Division incorrectly found that a discount could be applicable based on Schmidt's 2008 trial testimony because his testimony regarding application of a marketability discount was stricken for lacking foundation. Robert also asserts that the appellate court's decision defies the broad equitable discretion afforded to the remand judge who presided over the case for a decade and determined that such a discount ought not apply.

B.

Ras and the corporate entities of Koger, KDS, KPS, and Koger Limited (Dublin)[9] are represented by different counsel, but we consider their arguments together because they are substantially similar. Defendants urge this Court to affirm the Appellate Division's finding that a remand was appropriate for the reconsideration of the valuation of KDS and KPS. Defendants assert that a marketability discount is applicable based on the idiosyncratic corporate structure and relationship between Koger, KDS, and KPS. According to defendants, failure to apply such a discount would award Robert a windfall and thereby eviscerate the judiciary's role in determining the fair value of closely held corporations. Defendants maintain that the trial court was not required to accept Klein's valuation simply because it was "unrebutted." The corporate entities of Koger, KDS, KPS, and Koger Limited further argue that the alleged post-judgment conduct of George and Ras does not bear upon the value of KDS and KPS because the entities operated in good faith ever since the filing of Robert's complaint in 2007 and the alleged post-judgment misfeasance of George and Ras has nothing to do with the entities.

---

[9] Koger Limited (Dublin) was formed to facilitate operations in Ireland.

21

IV.

A.

Our standard of review for valuation disputes is deferential because the valuation of closely held corporations is "inherently fact-based[,]" not based in "exact science," and "frequently become[s] battles between experts." Balsamides, 160 N.J. at 368. Factual findings by a trial judge are significant as "[o]nly the trial court has the opportunity to see, hear, and question such expert witnesses." Ibid. Accordingly, we must not disturb a factual finding of the trial court "unless it is clearly erroneous or shows an abuse of discretion." Ibid. (quoting Madeline Marzano-Lesnevich and Francine Del Vescovo, The Minority Discount, 18 N.J. Fam. L. 338, 339 (1998)).

However, "we need not give deference to the trial judge's determinations of what discounts or premiums the determination of fair value may include, or must exclude, since they are questions of law." Casey v. Brennan, 344 N.J. Super. 83, 110 (App. Div. 2001), aff'd, 173 N.J. 177 (2002). "[T]he determination of whether a 'marketability discount' is applicable implicates a question of law" and is therefore reviewed de novo. Balsamides, 160 N.J. at 373.

B.

1.

In our 2013 opinion in this matter, we held that Robert did not meet the standard of an oppressed shareholder pursuant to N.J.S.A. 14A:12-7. Sipko, 214 N.J. at 382. We nevertheless held that "a minority shareholder's failure to demonstrate conduct that rises to the level of oppression does not necessarily deprive him of a remedy" because N.J.S.A. 14A:12-7(1)(c) "does not limit the equitable power of the courts to fashion remedies appropriate to an individual case." Id. at 382-83. We further noted that the trial court's equitable powers enabled it to fashion a remedy. Id. at 383-84.

Much of our jurisprudence has considered the application of a marketability discount in a corporate buyout in the context of matters involving shareholder oppression. See, e.g., Balsamides, 160 N.J. at 372; Lawson, 160 N.J. at 407-08. Although we leave intact our previous finding that Robert did not demonstrate himself to be an oppressed shareholder, we nevertheless look to N.J.S.A. 14A:12-7(1)(c) and our jurisprudence regarding the formulation of remedies for oppressed minority shareholders to inform our analysis of whether the Appellate Division properly remanded this matter for a determination of whether a marketability discount is applicable.

23

In Brenner v. Berkowitz, we rejected the defendants' argument that fraudulent and illegal acts do not violate N.J.S.A. 14A:12-7(1)(c) "unless the plaintiff also can show that such acts oppress the minority shareholder." 134 N.J. 488, 506 (1993). Even if the minority shareholder is not deemed to be oppressed, we held that such conduct may be actionable under the statute because "[i]llegality and fraud may also frustrate a shareholder's reasonable expectations for a company but nonetheless not qualify as oppression." Id. at 506-07. We noted that the statute affords to such shareholders a range of individualized remedies in the presence of appropriate proofs:

> [I]n addition to demonstrating fraudulent or illegal conduct, mismanagement, or abuse of authority, or oppressive or unfair conduct, a plaintiff must also demonstrate a nexus between that misconduct and the minority shareholder or her interest in the corporation. The remedies that a court will apply will logically depend on the harm to the minority shareholder or her interest in the corporation.
>
> [Id. at 508.]

We emphasized that N.J.S.A. 14A:12-7(1)(c) does not limit or preempt the courts' equitable power in fashioning appropriate remedies to a business dispute, specifically observing "that the enactment of N.J.S.A. 14A:12-7 was not intended to supersede the inherent common law power of the Chancery Division to achieve equity." Id. at 512. We also enumerated a broad range of

24

judicial remedies that courts can utilize in adjudicating disputes over closely held corporations, including ordering an accounting and appointing a special fiscal agent to oversee the corporation. Id. at 513-15.

The Oppressed Shareholder Statute contains a buyout section, N.J.S.A. 14A:12-7(8)(a), which provides in part, that

> [u]pon motion of the corporation or any shareholder who is a party to the proceeding, the court may order the sale of all shares of the corporation's stock held by any other shareholder who is a party to the proceeding to either the corporation or the moving shareholder or shareholders, whichever is specified in the motion, if the court determines in its discretion that such an order would be fair and equitable to all parties under all of the circumstances of the case.
>
> > (a) The purchase price of any shares so sold shall be their fair value as of the date of the commencement of the action or such earlier or later date deemed equitable by the court, plus or minus any adjustments deemed equitable by the court if the action was brought in whole or in part under paragraph 14A:12-7(1)(c).
>
> [(emphases added).]

As we stated in Balsamides, the buyout section not only "recognize[d] that the most sensible remedy to resolve problems of deadlock, dissension, or oppression often will be to 'effect a corporate divorce,'" but it also considered that "a purchase and sale of shares at a fair price may be more desirable to all

25

parties than a dissolution."  160 N.J. at 372 (quoting 2 John R. MacKay II, New Jersey Business Corporations, § 14-6(d)(2)(a) (2d ed. 1996)).

2.

The determination of fair value does not involve a rigid application of an inflexible test because "[n]o general formula may be given that is applicable to the many different valuation situations."  Bowen v. Bowen, 96 N.J. 36, 44 (quoting Rev. Rul. 59-60, 1959-1 C.B. 237).  The "assessment of fair value requires consideration of 'proof of value by any techniques or methods which are generally acceptable in the financial community and otherwise admissible in court.'"  Lawson, 160 N.J. at 397 (quoting 1 John R. MacKay II, New Jersey Business Corporations, § 9-10(c)(1) (2nd ed. 1996)).

Whether the corporation's fair value should be reduced by a marketability discount or any other discount is part and parcel of the fair value determination.  See Balsamides, 160 N.J. at 375 ("In calculating the 'fair value' of [the oppressor's] stock, the main question to be resolved is whether the corporation's value should be reduced by a marketability or other discount.").  Although adversaries agree with the flexible approach in determining fair value, they often disagree on whether the fair value to be paid to an oppressed shareholder should reflect a marketability discount.  Lawson, 160 N.J. at 397-98.

Marketability discounts "reflect the decreased worth of shares of stock in a closely held corporation, for which there is no readily available market." Balsamides, 160 N.J. at 375. Such a discount "adjusts for a lack of liquidity in one's interest in an entity, on the theory that there is a limited supply of potential buyers for stock in a closely held corporation." Lawson, 160 N.J. at 398-99. "Some commentators observe that a marketability discount is not a discount at all," but rather "a price adjustment reflecting factors typical of close corporations," which "include dependence on key employees or key customers, and go beyond the ready salability or liquidity of the firm. Balsamides, 160 N.J. at 379.

As we stated in Lawson, "[t]he very nature of the term 'fair value' suggests that courts must take fairness and equity into account in deciding whether to apply a discount to the value of the dissenting shareholders' stock." 160 N.J. at 400. In fact, N.J.S.A. 14A:12-7(8) expressly authorizes a court, "[u]pon motion of the corporation or any shareholder who is a party to the proceeding," to judicially order a sale of the corporation's stock held by any shareholder who is party to the litigation if the court determines that "would be fair and equitable to all parties under all of the circumstances of the case."

Depending on the facts, we have held that fairness and equity can compel the decision to apply such a discount, or not. Stated differently,

27

"[a]pplication of the equities . . . [can] dictate[] opposite results." Balsamides, 160 N.J. at 382.

In Balsamides, we held that the application of a 35 percent marketability discount was appropriate, reasoning that the Oppressed Shareholder Statute does not permit the oppressor to harm his partner and then be rewarded with the right to be bought out by the oppressed partner at an undiscounted value. Id. at 382-83. There, the plaintiff requested judicial dissolution of a closely held corporation following numerous spiteful actions by the defendant. Id. at 354, 358. The trial court ordered the buyout and applied a 35 percent marketability discount. Id. at 359. In upholding the trial court's application of the marketability discount, we emphasized that "where the oppressing shareholder instigates the problems, . . . fairness dictates that the oppressing shareholder should not benefit at the expense of the oppressed." Id. at 382. Stated simply, the basic principles of equity could not require that the oppressed party pay an undiscounted price for the oppressor's stock because doing so would penalize the oppressed and reward the oppressor. Ibid. We noted that we did not want to afford a shareholder any incentive to oppress other shareholders for personal gain. Id. at 382-83.

In Lawson, decided the same day as Balsamides, we held that in calculating the "fair value" of the dissenters' shares, it would be inequitable to

28

apply a 25 percent marketability discount. Lawson, 160 N.J. at 407-08. There, the corporation approved a plan to restructure the corporation in an attempt to restrict future public sales of the company's stock; the approval triggered the dissenting shareholders' rights to demand payment of the "fair value" of their shares under the Appraisal Statute, N.J.S.A. 14A:11-1 to -11. Id. at 389. The corporation ultimately offered the dissenting shareholders $41.50 per share, after applying a 25 percent marketability discount from a fair value range of $52.65 to $56.70 per share. Id. at 389-90.

We reasoned that to allow the majority shareholders to buy out the minority dissenters at the price of $41.50 would penalize the minority for exercising their statutory rights; encourage the majority to remove and buy out shareholders to their benefit and potentially "reap a windfall from the appraisal process by cashing out a dissenting shareholder"; and create an incentive for the majority to engage in activities designed to sow dissent and "encourage corporate squeeze-outs." Id. at 402. Application of the marketability discount, in that case, would have frustrated the purposes of the Appraisal Statute, and such results would be "clearly undesirable." Ibid. Hence, we reversed and remanded for the recalculation of the "fair value" of the dissenters' shares without application of the marketability discount. Id. at 408.

Balsamides and Lawson underscore the importance of determining the "fair value" of a corporation on a case-by-case basis. Balsamides, 160 N.J. at 381 (noting that "[a]lthough it would be helpful to pronounce a consistent rule regarding the determination of 'fair value' and the applicability of discounts under various circumstances, we cannot do so" because "[e]ach decision depends not only on the specific facts of the case, but also should reflect the purpose served by the law in that context" (quotations omitted)). The guiding principle in such cases is that a marketability discount cannot be used unfairly by the parties whose misconduct and bad faith caused the corporate split to benefit themselves to the detriment of the injured parties. Id. at 383.

V.

A.

The sole issue before this Court is whether the Appellate Division erred in remanding this case to the trial court for a determination of whether a marketability discount must be applied to the values of KDS and KPS. As noted in our jurisprudence, "courts must take fairness and equity into account in deciding whether to apply a discount to the value" of a company in a buyout. Lawson, 160 N.J. at 400. With fairness and equity in mind, we certainly cannot ignore the many instances in which defendants took deliberate

30

steps to prevent Robert from recovering any value he might achieve throughout the course of litigation.

Defendants continue to argue that KDS and KPS had no independent value, despite this Court's 2013 finding that the companies did have value. Quite frankly, there is no better indicator of how valuable the companies were than defendants' own transparent actions to swiftly and methodically gut the entities of any worth during the pendency of the litigation to ensure that Robert would never see any of that value they continue to claim is non-existent. Defendants knew how valuable the companies were. That is why, as the trial court noted, "the bones have been picked," and defendants completely stripped away all value when the possibility of having to turn some of it over to Robert arose.

Defendants assert that post-judgment and post-remand conduct should not be considered in determining whether equity requires the application of a marketability discount. Even without defendants' misfeasance, blatant misrepresentations to the trial court, lack of transparency regarding their financials and financial transactions, and, in George's case, fleeing the country to escape enforcement of the court's order, actions which are all contemptible, defendants engaged in enough pre-judgment misconduct between the filing of

the complaint and this Court's 2013 opinion to justify not applying the discount when considering the equities.

In one instance, Ras backdated the KPS stock transfer certification from February 2006, the date on which Robert acknowledged his surrender of shares in both KDS and KPS, to December 2004. Based on the evidence before the trial court, the trial judge concluded that Ras either personally backdated the document or caused someone to do so with the intention to deprive Robert of his interest in KPS attributable to certain contracts Robert negotiated in 2005 which resulted in substantial profits for the company beginning in 2006. By falsifying evidence of Robert's relinquishment of his interest in KPS, Ras, as found by the trial court, "was attempting to depress the value Robert could hope to achieve" and disrupt Robert's true potential to capture value for his interests. Once again, defendants' own actions lay bare their understanding of just how valuable the companies were. Although Robert signed away his interests in both companies in February 2006, it is telling that only the KPS transfer certificate was falsely backdated. Given that KPS was over 10 times more valuable than KDS, it is quite clear why the target of the fraudulent backdating was KPS.

Additionally, the comprehensive accounting of both KDS and KPS ordered by the trial court illuminated defendants' deliberate and dubious

32

actions undertaken for the sole purpose of rendering KDS and KPS completely valueless. According to the accounting, by the end of 2005, KDS and KPS had entered into very valuable five-year contracts with automatic renewal provisions. As for KPS, it generated $5,149,575 in revenue in 2006, $8,994,899 in 2007, and $8,086,147 in 2008. However, in 2009, KPS earned less than $200,000, and less than $100,000 in 2010. That dramatic decline in revenue coincided with the litigation in this matter. The trial court found that George and Ras began to redirect revenue from KPS to Koger beginning in 2008, just after the complaint was filed. Four out of seven KPS contracts were transferred to Koger either during litigation or after the Appellate Division held in 2011 that Robert's surrender of his interest in the two companies was void. Just as it defies logic to believe defendants suddenly had to make an overseas payment of $20 million cash one day after the trial court informed them that they owed Robert approximately the same amount of money, it is no coincidence that KPS became a shell of an entity just as Robert was asserting his interests through the court system. As for KDS, defendants assigned one lucrative contract to Koger in September 2007, and the others held by the company essentially lapsed without renewal.

Just as the trial court noted, we cannot "ignore the reality that steps were knowingly taken to deplete the value of assets Robert was asserting one-half

33

interest in." Defendants' bad-faith behavior throughout this 15-year litigation occurred for the specific and obvious purpose of preventing Robert from being fairly compensated for his interests. Defendants now ask the Court, after acting unfairly at almost every turn, to apply a doctrine rooted in fairness to relieve them of their responsibility to buyout Robert for the amount determined by the trial court. We decline to do so. If ever there was an instance in which equity <u>did not</u> fall in a party's favor, it is this case.

In light of all the defendants' conduct regarding KDS and KPS to strip Robert of his rightful interests, equity cannot abide imposing a discount to the benefit of defendants.

B.

The Appellate Division found that the trial court, on remand, erred in accepting Klein's testimony from 2008 and failed to reach "a reasoned, just and factually supported conclusion." The Appellate Division noted that the trial judge had "implicitly rejected" Klein's opinion at trial in concluding that KDS and KPS had no value; the court also stressed that the trial court failed to explain its later acceptance of Klein's valuation on remand. We disagree and find that the trial court's judgment was fully supported by the record.

We defer to the trial judge's findings in this matter, particularly because the trial judge handled this matter for over a decade, presided over the bench

34

trial, heard testimony, asked questions, and had, by far, the best feel for the

case.  See, e.g., Township of West Windsor v. Nierenberg, 150 N.J. 111, 132

(1997) ("The rationale underlying that limited scope of appellate review is that

a trial judge's findings are substantially influenced by his or her opportunity to

hear and see the witnesses and to get a 'feel' for the case that the reviewing

court cannot enjoy.").  The now-retired trial judge presided over the bench trial

during which Klein testified -- filling 165 pages of transcript -- and was

subject not only to cross-examination by defense counsel, but also questioning

by the trial judge regarding his valuation of the companies.  Defendants'

expert, Schmidt, also testified, and the trial judge questioned him as well.

During Schmidt's testimony regarding the application of a 35 percent

marketability discount, he admitted that his basis for applying the discount was

"instructions from counsel that in this -- based on the facts of this case, it was

appropriate."[10]

It was within the trial court's wide discretion to accept or reject an

expert's testimony, either in whole or in part.  Brown v. Brown, 348 N.J.

_____

[10]  At trial, Robert's counsel moved to strike Schmidt's testimony regarding
the marketability discount.  After Schmidt testified that he included the
discount because defense counsel instructed him to do so, the trial judge
sustained the objection.  The court did not decide whether the discount applied
but noted, "if that's the basis of his rendering the opinion, then I don't really
want to hear the criticism of the other guy," in reference to Klein.

35

Super. 466, 478 (App. Div. 2002) ("A trial court is free to accept or reject the testimony of either side's expert, and need not adopt the opinion of either expert in its entirety."). On remand, the trial court accepted Klein's valuation of the companies as "coherent and convincing." It was certainly within the court's discretion to do so, particularly in light of the remand record that put in focus defendants' actions during the litigation to decimate KDS and KPS. The trial court properly exercised its discretion in accepting Klein's testimony over Schmidt's testimony, which was struck from the record, in part, because -- by his own admission -- the sole basis for his "expert opinion" on including a marketability discount was defense counsel's directive to do so.

Certainly, this Court's 2013 opinion placed the trial court in an unusual situation. The trial court found in 2009 that KDS and KPS had no independent value. This Court, in affirming the Appellate Division at the time, found that the companies did in fact have value and that Robert's surrender of his 50 percent interests was void for lack of consideration. We remanded the matter back to the trial court to determine what remedy, if any, could be fashioned to fairly compensate Robert for his interests in the two companies. In following this Court's directive on remand, the trial court had to take a position that was the complete opposite of the one it took in 2009 because that determination

36

had been reversed.  Indeed, the trial judge even noted the following in his

September 2016 letter decision:

> I readily concede that portions of my decision differ from previous ruling[s] made in this case.  I previously ruled KPS and KDS had no independent value as of the date of the commencement of this case in November of 2007 . . . .   I have now recognized that the companies each had value, and I have valued them.  That is a result of Appellate and Supreme Court determinations in this case.  There is no basis to request of me that I reconsider the determinations of those tribunals on this fundamental point.
>
> . . . .
>
> On the quantification of value, the [defendants] demurred when invited by the court to consider a new expert, post-remand . . . .   That left the court with Hubert Klein's unrebutted values, which I accepted.  In the course of doing so, I abandoned, as I am bound by my oath to abandon, the belief that KDS and KPS were valueless creatures of George Sipko and Koger, Inc. -- a concept [the defendants] to this day refuse[] to abandon, but which the Appellate Division and the Supreme Court has  determined to be unsupportable and incorrect.

For the Appellate Division to find that the trial court failed to reach a reasoned

and just conclusion, in part because it failed to explain its differing position on

remand, ignores the reality of the appellate process that oftentimes, as in this

case, requires trial courts to proceed on remand in a manner that is the

complete opposite of the court's previous position.  The trial court certainly

cannot be faulted for following the directives of this Court on remand and abandoning its previous holding, which had been reversed on appeal.

In remanding the matter, the Appellate Division directed the trial court to consider all sources of information regarding "the fairness and equity of Klein's suggested buyout price, including Schmidt's criticisms." There are several reasons why the trial court logically did not consider Schmidt's testimony from 2008. First, Schmidt did not separately value KDS and KPS because defendants instructed him not to do so. During trial, Schmidt considered all the entities together as one and never put forth an independent value for KDS or KPS. Second, as noted above, Schmidt's testimony regarding the application of a marketability discount was stricken from the trial court record.

Lastly, and most relevant to this Court's remand in 2013, Schmidt testified that KDS and KPS had no independent value. That was the crux of Schmidt's expert testimony and part of his criticisms of Klein's valuation. It bears repeating: In 2013, this Court found that KDS and KPS did have independent value. Schmidt previously testified that KDS and KPS had no independent value and the trial court agreed at that time. We reversed that finding. So it stands to reason that it would serve no purpose whatsoever for

the trial court to revisit the testimony of an expert whose position was reversed by this Court almost a decade ago.

The trial court did, however, give defendants an opportunity on remand to call an expert to present their position on the valuation of the companies. Recognizing that their expert at trial did not value the companies independently, the trial court gave defendants the chance to present the testimony anew in light of this Court's remand. Defendants declined, making the strategic decision to refuse to abandon their argument that the companies had no value. Even before this Court, counsel for Ras continued to argue the lack of value in the companies. This Court held almost a decade ago that the companies had independent value and we do not revisit that finding, regardless of defendants' continued inability to accept it.

Defendants claimed before the trial court and the Appellate Division that they declined to present an expert on remand because they could not have imagined that the trial court would order a buyout, given that there was no finding of shareholder oppression. But as this Court's 2013 opinion noted, the lack of a finding of shareholder oppression did not prevent the trial court from exercising its equitable powers to fashion a remedy for Robert. Furthermore, in ordering the accounting in 2014, the trial court specifically noted that the results of the accounting could justify certain remedies, including a buyout.

Defendants therefore cannot continue to ignore this Court's 2013 decision and pretend that they were unaware that a buyout was a possibility.

Defendants took a risk and it did not pay off. Defendants now want another bite at the apple, but given all that has transpired in this case and all of defendants' misconduct, we cannot allow that. Were we to grant defendants another remand to address the very issue they had the opportunity to fully litigate during the first remand, we would be promoting the principle that "repetitive bites at the apple are allowed." See Cummings v. Bahr, 295 N.J. Super. 374, 384 (App. Div. 1996). We decline to provide defendants with another bite of "this thoroughly chewed apple." See Whitfield v. Blackwood, 101 N.J. 500, 500 (1986) (Clifford, J., concurring).

## VI.

For the foregoing reasons, we reverse the judgment of the Appellate Division and remand the matter to the trial court to reinstate its August 19, 2016 judgment.


CHIEF JUSTICE RABNER; JUSTICES ALBIN and SOLOMON; and JUDGE FUENTES (temporarily assigned) join in JUSTICE PIERRE-LOUIS's opinion. JUSTICE PATTERSON did not participate.

40